## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**In Re SINALTRAINAL**          Case No. 01-3208-CIV-Martinez/Bandstra
**Regarding**

| | |
|---|---|
| SINALTRAINAL, JOHN DOE I, on behalf of himself and as the representative of the Estate and heirs of Isidro Segundo Gil; JOHN DOE II; LUIS ADOLFO CARDONA, | ) ) ) ) **SECOND AMENDED** ) **COMPLAINT FOR EQUITABLE** ) **RELIEF & DAMAGES** |
| Plaintiffs, | ) ) |
| v. | ) ) **JURY TRIAL DEMANDED** |
| RICHARD I. KIRBY, BEBIDAS Y ALIMENTOS de URABA, S.A., ISLAND CAPITAL INVESTMENTS, INC. | ) ) ) |

*NIGHT BOX FILED*

*MAY 23 2005*

*CLARENCE MADDOX*
*CLERK, USDC / SDFL / MIA*

### SECOND AMENDED COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES JURY TRIAL DEMANDED

### I. INTRODUCTION

1.       This case involves the systematic intimidation, kidnapping, detention and murder of trade unionists in Colombia, South America at the hands of paramilitaries working as agents of corporations doing business in that country.  The violent persecution of trade unionists in Colombia has been at epidemic proportions for many years.  Since 1986 when the Central Unitaria de Trabajadores de Colombia ("CUT"), the largest trade union confederation in Colombia, was formed, over 4,000 trade unionists have been murdered.  Presently, of every five (5) trade unionists murdered in the world, over 3 are Colombian.  This case, along with three other related cases filed with this Court, is brought under the Alien Tort Claims Act (ATCA), Torture Victim Protection Act (TVPA) and state tort law, and seeks  to remedy and prevent the violent persecution of trade unionists at various Coca-Cola bottlers in Colombia.

## II. NATURE OF THE ACTION

2.      Plaintiff SINALTRAINAL is a Colombian trade union and a member of the CUT. SINALTRAINAL represents workers at a number of beverage and food companies in Colombia, including several Coca-Cola bottling plants throughout Colombia. SINALTRAINAL (also referred to herein as the "Union") has been decimated by the intimidation, kidnapping, detention, torture and assassination of numerous of its leaders by paramilitary forces working as agents of corporate concerns, including Defendants, in Colombia. Plaintiff Union brings this Complaint for equitable relief and damages to remedy the injury to itself caused by the wrongful conduct of the Defendants Richard I. Kirby, Bebidas y Alimentos de Uraba, S.A. (hereinafter referred to as "Bebidas") and Island Capital Investments, Inc. ("Island Capital").

3.      Plaintiff John Doe I is a relative of Isidro Segundo Gil, (and here represents the Estate of Isidro Segundo Gil as well as the heirs of Isidro Gil) who was murdered by paramilitary forces inside the Carepa plant of Defendant Bebidas y Alimentos. Plaintiff John II is also an immediate family member of Isidro Segundo Gil. Plaintiffs John Doe I and John Doe II (collectively referred to herein as "John Doe Plaintiffs") bring this Complaint against Bebidas, Richard I. Kirby and Island Capital for damages to remedy the wrongful death of Isidro Segundo Gil which was proximately caused by the wrongful conduct of these Defendants.

4.      Plaintiff Luis Adolfo Cardona is a citizen of Colombia who is in exile in the United States. Luis Adolfo Cardona was a worker at the Bebidas plant in Carepa, Colombia and an active member of the SINALTRAINAL union. He witnessed the murder of Isidro Gil, and, very shortly after this murder, was himself captured and detained by paramilitaries who threatened to torture murder him because of his union

2

affiliation as well as the fact that he was a witness to the murder of Isidro.  He barely

escaped with his life and fled immediately to Bogota, Colombia with his family.

Because of continued threats against his life, which constitute torture and/or cruel,

inhumane and degrading treatment, he fled in exile to the United States where he is

currently seeking asylum.

       5.        Plaintiffs herein also seek equitable relief to prevent further harm to

trade union leaders and members from the ongoing campaign of terror conducted on

behalf of Defendants in Colombia. This case is related to three similar cases filed in this

Court against  Defendants Coke and Coke Colombia involving other local bottlers in

Colombia owned and controlled by Panamerican Beverages, Inc., Panamco, LLC

(collectively referred to herein as "Panamco"); Panamco Industrial de Gaseosas, S.A.

a/k/a Panamco Colombia, S.A. (hereinafter referred to as "Panamco Colombia").

       6.        The claims in this case arise from Defendants' wrongful actions in

connection with their production, bottling and distribution of Coke products in Colombia.

With respect to their business operations in Colombia, the Defendants hired, contracted

with or otherwise directed paramilitary security forces that utilized extreme violence and

murdered, tortured,  unlawfully detained or otherwise silenced trade union leaders of the

Union representing workers at Defendants' facilities.  Isidro Gil has been subjected to

serious human rights abuses, including murder and extrajudicial killing in violation of the

Alien Tort Claims Act (ATCA), 28 U.S.C. §1350, the Torture Victims Protection Act

(TVPA),  international human rights law, and the common tort law of the state of

Florida.

       7.        Plaintiffs do not have access to an independent or functioning legal

system within Colombia, a country which is not governed by the rule of law.  Plaintiffs

have sought redress for the human rights violations described herein through the limited legal processes available to them to no effect. Plaintiffs' attempts to seek legal redress have been futile because those seeking to challenge official or paramilitary violence, including prosecutors and prominent human rights activists, are at great risk from retaliation. This has been well-documented in credible human rights reports by the U.S. Department of State, Human Rights Watch and Amnesty International. *The Ties that Bind: Colombia and Military-Paramilitary Links*, Human Rights Watch (February, 2000), at 2-3. Indeed, in the U.S. State Department's most recent human rights report on Colombia, the State Department expressly states that this very lawsuit was filed because of what the State Department characterizes as "the high rate of impunity" in Colombia.

8.     Further,  even if charges had been or could have been brought against the paramilitaries who murdered Mr. Gil and committed the other human rights violations at issue herein, this would be futile because of the lack of an independent or functioning legal system within Colombia. The justice system in Colombia has utterly failed to bring the perpetrators of anti-union violence to justice under the laws of Colombia. Indeed, not one perpetrator has been successfully prosecuted for any of the thousands of cases of trade union assassination which have taken place since 1986. Finally, even if there were remedies available to Plaintiffs in Colombia, such remedies are inadequate and would not afford the complete relief available to Plaintiffs by this Complaint. Defendants, because they do business in Colombia,  are well aware of these conditions, are aware of the fact that paramilitaries enthusiastically target trade unionists in Colombia,  and know that Plaintiffs do not have the option of seeking justice in Colombia for human rights violations that target trade unionists.

### III. JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, the ATCA and the TVPA, 28 U.S.C. §1350, for the alleged violations of international human rights law.  Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367.

10.      Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c)).

### IV. PARTIES

#### Plaintiffs

11.      Plaintiff SINALTRAINAL is a Colombian trade union that represents workers in the food and beverage industry in various locations in Colombia, including at the Coke bottling plant operated by Bebidas y Alimentos.  SINALTRAINAL has had numerous members and leaders assassinated and tortured by paramilitary forces.  Based on the allegations herein, this murder and torture has been perpetrated by paramilitary units that were acting as agents for one or more of the Defendants. SINALTRAINAL brings this action for injunctive relief to stop any further murder, unlawful detention, or torture of its leaders by the agents of Defendants. In addition, SINALTRAINAL seeks money damages to recover funds spent to protect its members and leaders who have received threats of death from the agents of Defendants, and funds provided for medical care, safe houses, and living expenses for members and leaders who have received threats of death from the agents of Defendants.

12.      Plaintiff John Doe I is a citizen and resident of Colombia, a living, immediate family relative of the deceased Isidro Segundo Gil, and representative of the Estate of Isidro Segundo Gil.  In addition, John Doe I is the guardian of the heirs of

Isidro Gil – Isidro Gil's two children who survive Isidro Gil as well as their mother, Isidro Gil's wife, who was herself murdered by paramilitaries in the year 2000. As such, Plaintiff John Doe I brings this case on behalf of himself for the damages he has suffered as a result of the death of Isidro Gil and on behalf of the Estate of Isidro Gil and Isidro Gil's remaining heirs. Isidro Gil was a citizen and resident of Colombia and local Union officer at Bebidas y Alimentos, who was murdered by employees and/or agents for Defendants Richard I. Kirby and Richard Kirby Kielland, acting through their alter ego and/or agent Defendant Bebidas y Alimentos. Plaintiff John Doe I brings this case anonymously because he has a reasonable and well-founded fear of imminent physical harm, including murder, by the same paramilitaries who murdered Isidro Gil should his identity as a Plaintiff in this lawsuit be made public.

13.     Plaintiff John Doe II is a citizen and resident of Colombia, a living, immediate family relative of the deceased Isidro Segundo Gil. Plaintiff John Doe II brings this case on behalf of himself for the damages he has suffered as a result of the death of Isidro Segundo Gil. Isidro Segundo Gil was a citizen and resident of Colombia and local Union officer at Bebidas y Alimentos, who was murdered by employees and/or agents for Defendants Richard I. Kirby and Richard Kirby Kielland, acting through their alter ego and/or agent Defendant Bebidas y Alimentos. Plaintiff John Doe II brings this case anonymously because he has a reasonable and well-founded fear of imminent physical harm, including murder, by the same paramilitaries who murdered Isidro Gil should his identity as a Plaintiff in this lawsuit be made public.

14.     Plaintiff Luis Adolfo Cardona is a citizen of Colombia who is in exile in the United States. Luis Adolfo Cardona was a worker at the Bebidas plant in Carepa, Colombia and an active member of the SINALTRAINAL union. He witnessed the murder of Isidro Gil, and, very shortly after this murder, was himself captured and

detained by paramilitaries who tortured him by threatening to murder him and his family

members because of his union affiliation as well as the fact that he was a witness to the

murder of Isidro Gil. He barely escaped with his life and fled immediately to Bogota,

Colombia with his family. Because of continued threats against his life, he fled in exile

to the United States where he is currently seeking asylum.

### Defendants

15.     Defendant Richard I. Kirby resides at 881 Ocean Drive, Unit 27-B,

Key Biscayne, Florida, 33149. From this location he manages and directs the operations

of numerous businesses, including Defendant Bebidas.

16.     Defendant Bebidas is a Coke bottling plant in Carepa, Colombia in the

department of Uraba where some of the events alleged herein occurred. As demonstrated

by the letterhead of Bebidas, Bebidas holds itself out as a Coca Cola company and places

the "Coca Cola" trademark above its own name on its letterhead with the express

permission of Coke. As stated in its articles of incorporation filed in Colombia,

Bebidas' corporate e-mail address is: "cocacola@edate1.net.co." Defendant Bebidas is a

closely held company owned by Defendant Richard I. Kirby. During all times relevant

hereto, Defendant Kirby has personally managed, controlled and directed the operations

of Defendant Bebidas y Alimentos from his residence at 881 Ocean Drive, Key

Biscayne, Florida, 33149. During all times relevant hereto, Defendant Kirby has also

managed, controlled and directed these operations through his family and through

Defendant Island Capital Investments, Inc. -- a corporate shell which exists and operates

as a mere instrumentality through which Richard Kirby has directed and controlled

companies such as Bebidas. During all times relevant hereto, Defendant Island Capital

Investments, Inc. ("Capital Investments) has been owned and controlled by Defendant

Kirby and his agents, and it is located and operated from Defendant Kirby's residence at 881 Ocean Drive, Key Biscayne, Florida, 33149.

17.     Defendant Bebidas y Alimentos is a closely-held company owned by Defendant Richard I. Kirby and other members of his family. During all times relevant hereto, Bebidas has been required to make, and has in fact made, all of its important decisions, including its labor and management decisions, in consultation with individuals and entities in the U.S. and in the State of Florida, including Richard I. Kirby, the Coca-Cola Company and Florida-based attorney William P. McCaughan who is an officer of Island Capital and permanently-retained counsel of Bebidas and Richard I. Kirby. Richard I. Kirby pays for all of Bebidas' legal expenses. In addition, as indicated in Dunn & Bradstreet Business Reports, Bebidas receives all of its credit from abroad. Nearly all of this credit comes from individuals and entities, including but not limited to Richard I. Kirby and Island Capital, in the United States and entities/individuals in Florida and this forum. Bebidas also imports materials for its production facilities in Colombia from the U.S. and the State of Florida. Bebidas representatives, including Silvia Enciso de Saenz and Richard I. Kirby acting on behalf of Bebidas, have regularly contacted individuals and entities in the State of Florida and this forum – via the telephone, mail and in-person meetings in this forum – in order to consult with and obtain business and legal advice from these individuals/entities; to solicit and obtain credit and financing; and to import materials. Further, Richard I. Kirby, has had discussions with third parties in the State of Florida, either in person or via telephone, regarding the possible sale of Bebidas.

18.     At all times relevant hereto, Defendant Island Capital, which is incorporated under the laws of the State of Florida, has owned at least 70% of Bebidas. Island Capital is in turn owned by Defendant Kirby – who, as indicated in the most

recent articles of incorporation filed with the state of Florida, is the President and Chief

Executive of Island Capital – and by Richard Kirby's wife Kitty, and William P.

McCaughan.  Bebidas has obtained significant financing and credit from Island Capital

and Richard I. Kirby and, through such individuals as General Manager Silvia Enciso de

Saenz, has actively solicited such financing and credit within the State of Florida and this

forum from Island Capital, Richard I. Kirby and other individuals and entities. Further, in

response to this lawsuit,   in 2003, Richard I. Kirby, with his wife, Kitty, and his counsel,

Mr. McCaughan, had discussions within the State of Florida and prepared all necessary

legal papers to transfer Island Capital's interest in Bebidas to the two children of Richard

and Kitty Kirby. The children either reside in or maintain a place of business in the State

of Florida.

         19.    Coke's control through the specific Bottler's Agreements and other

instruments of control extends to the smallest details of production.  For example,

according to the 10-K Report filed with the Securities and Exchange Commission on

December 31, 2000 by Panamco, another bottler working on behalf of Coke in

Colombia,  "[Coke] must also approve the types of containers used in bottling and

controls the design and decoration of the bottles, boxes cartons, stamps, and other

materials used in production. The [Bottler's] agreements grant [Coke] the right to inspect

the products." In addition, Coke, through the Bottler's Agreements, imposes standards

concerning employee qualifications and appearance and standards for the appearance and

condition of transport trucks.  Further, Coke also provides direction on issues of

environmental preservation and compliance with a code of conduct governing the

treatment of employees. Coke also monitors the labor relations practices of its

subsidiaries and bottlers, and requires that subsidiaries and bottlers refrain from activities

that will damage Coke's brand-name in the market place.  Richard I. Kirby, acting on behalf of Bebidas, as well as Bebidas managers, such as Silvia Enciso de Saenz, have, while physically present in the State of Florida and this forum, negotiated the terms of the aforesaid Bottlers' Agreement, received direction from and consulted with the Coca-Cola Company.

20.   Further, Coke maintains and exercises the right to conduct frequent inspections of the Bebidas plant in Carepa to ensure compliance with the specific terms of the Bottler's Agreements.   Coke in fact recently exercised this right by commissioning a corporation known as Cal-Safety to carry out an investigation of Bebidas' Carepa plant.  This investigation was in fact carried out by Cal-Safety in Carepa in the year 2005, and focused on the human rights and labor rights situation of this plant. In pertinent part, this investigation looked into the very human rights allegations at issue in this case.  Officials of both Coke and Cal-Safety met with representatives of Bebidas in the State of Florida and this forum in order to plan this investigation in advance as well as to discuss the findings of the investigation, the infractions which were uncovered by the investigation and what steps need to be taken to correct these infractions.

21.   Defendant Richard I. Kirby is vicariously liable for any wrongful acts alleged herein that were committed by any of their agents or employees, or any agent or employee of their alter ego and/or agent,  Defendant Bebidas y Alimentos, that resulted in harm to any of the Plaintiffs.  As further discussed below, Richard I. Kirby directed and managed the Bebidas operations in Carepa, including its labor-management relations, at the time of the human rights violations at issue herein and, though put on notice of the impending violence against SINALTRAINAL and its leadership at the Bebidas plant, willfully failed and refused to prevent this violence.  During the events in question in this

lawsuit, Richard I. Kirby at times directed and managed the Bebidas operations from his

home in Key Biscayne, Florida.

## V. BACKGROUND FACTS CONCERNING VIOLENCE AGAINST TRADE UNION LEADERS AND MEMBERS IN COLOMBIA

22.   Colombia is widely known as a country that is torn by a long-standing

civil war involving armed leftist groups on the one side and the Colombian military as

well as right-wing paramilitaries on the other.  It is universally acknowledged that the

regular military in Colombia, and the civil government authorities, tolerate the

paramilitaries, allow them to operate, and often cooperate, protect and/or work in concert

with them.

23.     The extent of the civil conflict is so pervasive that the country's civil

war necessarily must be governed by the rules of war so that the combatants, the right

wing paramilitaries, the leftist guerillas, and the regular military are governed by  Article

3 of the Geneva Convention, which applies to "an armed conflict not of an international

character."  Thus, noncombatants to the Colombian civil war, including Plaintiffs herein,

are protected from human rights violations and other war crimes committed by any

parties to the conflict, regardless of whether the combatant parties are formally

recognized as government officials. This includes the paramilitary forces which clearly

are major participants in the civil conflict.

24.     The paramilitaries in Colombia, including those directly involved in

the wrongful acts alleged herein, were created based on official sanction of the

Government of Colombia. Under "Law 48," passed in 1968, the Defense Ministry was

authorized to create and provide weapons to civil patrols.   It is by this authorization that

most of the paramilitaries were created and sustained in Colombia.   In 1989, the

Colombian Supreme Court declared the law unconstitutional.  However, 21 years of

close, lawful and open collaboration allowed the Colombian Armed Forces and the paramilitaries to create solid and lasting relationships which continue unabated to this day.

25.   In 1994 the Colombian government effectively re-legalized paramilitary organizations in Decree 356, which established the "Special Vigilance and Private Security Services."   This decree laid the foundation for the creation of the Convivir groups, officially launched in 1995 through Resolution 368.  *See* Latin American Working Group, *The Wrong Road: Colombia's National Security Policy*, p. 14 (July 2003).  The Convivir groups are comprised of civilians who petition the government for a license to "provide their own security... in areas of high risk or in the public interest, which requires a high level of security."  Defense Ministry, Decree 356, República de Colombia, February 11, 1994, pp. 19-20; and Resolution 368, April 27, 1995.  Convivir members interviewed by Human Rights Watch confirmed that they regularly supply the Colombian army with intelligence, routinely collaborate with Colombian security forces, and are supervised by a government agency within the Defense Ministry.  One Convivir commander stated frankly, "We are paramilitaries, macetos, or Convivir, whatever the hell you want to call us."  Human Rights Watch, *War Without Quarter: Colombia and International Humanitarian Law* (1998).

26.   Paramilitary groups continue to thrive and enjoy *de facto* approval from the government, and the Colombian military often outsources its "dirty work" to the paramilitaries in an attempt to clean up its own international image.  Indeed, the decrease in human rights violations the military has committed since the early 1990s has been matched by a proportional increase in human rights violations attributed to paramilitaries. *Human Rights Watch Annual Country Reports for Colombia, 1990-2002.  See* http://www.hrw.org/reports/world/colombia-pubs.php.

27.     The paramilitaries in Colombia have a mutually-beneficial, symbiotic relationship with the Colombia government's military. According to a recent report by Human Rights Watch,  the relevant facts of which Plaintiffs incorporate herein by reference, 78% of the murders in Colombia from October 1999 to March 2000 were attributable to the paramilitaries. *The Ties that Bind: Colombia and Military-Paramilitary Links*, Human Rights Watch (February, 2000), at 2.  The Human Rights Watch investigators found "detailed, abundant, and compelling evidence of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations." *Id.* at 1.  The facts supporting the ongoing symbiotic relationship between the military and paramilitaries in Colombia include that active and retired military actually set up paramilitary units, the military provides the paramilitaries with weapons, intelligence, and supplies, and the paramilitaries conduct missions at the request of the military. *Id.* at 2-3.

28.     The close, symbiotic relationship between the military and paramilitaries in Colombia is so widely acknowledged that even the U.S. State Department's *Country Reports on Human Rights Practices – Colombia* (February 2001) at 5 confirms this fact without reservation:

> Credible allegations of cooperation with paramilitary groups, including instances of both silent support and direct collaboration by members of the public security forces, in particular the army, continued.  Evidence suggests that there were tacit arrangements between local military commanders and paramilitary groups in some regions, and paramilitary forces operated freely in some areas that were under military control or despite a significant military presence.  Individual members of the security forces actively collaborated with members of paramilitary groups – passing them through roadblocks, sharing intelligence, providing them with ammunition, and allegedly even joining their ranks while off-duty.

29.     The close, symbiotic relationship between the military and paramilitaries

in Colombia is such that the paramilitaries are acting under color of the authority of the government of Colombia. The paramilitaries in Colombia, including those who committed the wrongful acts alleged herein, are legal creations of the government of Colombia, and they act with support from and cooperation with the official military.

30.     In order to have plausible deniability, the Government of Colombia does not officially sanction the murders and other human rights violations committed by the paramilitaries. However, there have been few successful prosecutions of paramilitaries because the Government of Colombia knowingly permits the paramilitaries to operate and to carry out assignments for the formal military.

31.     The paramilitaries in Colombia are particularly well-known for murdering, abducting and torturing trade union leaders who they view as being subversives.   The paramilitaries' characterization of trade unionists as subversives is in accord with the view of the Colombian government which, in Decree 180, has designated trade union leaders as "terrorists." The murder of Isidro Gil was one of many acts of violence against trade union leaders by paramilitaries that is openly tolerated and quietly encouraged by the Government of Colombia.  Defendants have known since the inception of their operations in Colombia that these paramilitaries enthusiastically target trade unionists. Defendants have further known that the military base operating in Carepa has also operated as the *de facto* paramilitary base and that the paramilitaries on this base have targeted trade unionists for violence, including assassination.

32.     As a consequence of the official vilification of trade unionists by the Colombian government, which serves as an open invitation to paramilitaries to target trade union leaders with violence, Colombia has led the world in the number of murders of trade unionists for the past 10 years.   More than 90 trade unionists were killed in 2003, over 184 were killed in 2002, and in the last 10 years, over 1,500 have been

murdered.   A much larger number have been subjected to torture, including regular threats of death, unlawful detention, and kidnapping.

33.     In addition to the referenced reports by Human Rights Watch and the U.S. State Department, there is comprehensive public reporting on the systematic human rights violations occurring in Colombia by the paramilitaries, as well as on the specific targeting for murder and other human rights violations of trade union leaders and members. Major print and television media in the U.S. have reported on the violence in Colombia targeting trade union leaders. In addition, international organizations, including Amnesty International, the International Labor Organization, and the United Nations Commission on Human Rights have all reported extensively on paramilitary violence against trade union leaders in Colombia. At the time of the events alleged herein, Defendants knew, or were substantially certain, that they were doing business in an environment in Colombia where their workers who were members of trade unions were at great risk of being murdered, tortured, kidnapped or unlawfully detained by paramilitaries working for or on behalf of Defendants' alter egos and/or agents in Colombia.

## VI.  SPECIFIC EVENTS AT BEBIDAS Y ALIMENTOS LEADING TO THE MURDER OF ISIDRO GIL

34.     In April of 1994, paramilitary forces created by legal authorization of the Government of Colombia, and acting in a cooperative and symbiotic relationship with the government, murdered Jose Eleazar Manco David and Luis Enrique Gomez Granado, both of whom were workers at Bebidas y Alimentos and members of SINALTRAINAL.

35.     The paramilitary forces in Carepa then began to intimate other SINALTRAINAL members as well as the local leadership of SINALTRAINAL, telling

them, upon threat of physical harm, to resign from the union or to flee Carepa altogether. The management of Bebidas y Alimentos permitted these paramilitary forces to appear within the plant to deliver this message to Union members and leaders.   A number of Union members began leaving town as a result.  And, in April of 1995, following more death threats, every member of the executive board of the SINALTRAINAL local representing the Bebidas y Alimentos workers fled Carepa in fear for their lives.

36.     In June of 1995, the SINALTRAINAL local union elected a new executive board to replace the one that had fled.  Isidro Gil was elected as a member of this new board, as was an individual named Dorlahome Tuborquia.  Shortly thereafter, in July of 1995, the management of Bebidas y Alimentos hired members of the paramilitaries who were known by the management and employees of Bebidas y Alimentos to be among the paramilitaries who had threatened the first Union executive board into fleeing.  These members of the paramilitaries were hired both into the sales and production departments.

37.     In September of 1995, Ariosto Milan Mosquera, was hired by Richard I. Kirby as the plant manager of the Bebidas y Alimentos plant in Carepa. He was an employee and agent of  Bebidas y Alimentos.  Mosquera acted quickly to take steps to rid the company of the Union. First, he discharged Dorlahome Tuborquia, one of the newly elected SINALTRAINAL leaders. The Union challenged this discharge through the legal process, and a judge, finding the discharge to be unlawful, ordered Bebidas y Alimentos to rehire Tuborquia.  He returned to work at Bebidas y Alimentos in December of 1995.

38.     Shortly after the return of Tuborquia, Bebidas y Alimentos Manager Mosquera began aggressively and publically threatening to destroy the union.  He met with leaders of the paramilitaries in Carepa, people he already knew, and he was familiar with their operations. Mosquera and the local paramilitary leaders made a specific

agreement to drive the Union out of the Coke bottling plant using threats of violence, and if required, actual violence. This explicit agreement constituted a conspiracy. The paramilitaries that Mosquera conspired with were, as Richard I. Kirby was well aware, functioning openly in Carepa out of the military base in the town, and were supported by and received cooperation from the military and police forces in the area such that the paramilitaries were in a symbiotic relationship with the military and police forces in the area.

      39.     As a first step in the conspiracy to drive SINALTRAINAL out of Bebidas y Alimentos, Mosquera, speaking as an employee and agent of Bebidas y Alimentos, announced in public that he would use the paramilitaries in Carepa to destroy the union. In addition, Mosquera, in the presence of the paramilitary forces he had conspired with, told a member of the local SINALTRAINAL executive board that he would "sweep away the union." In furtherance of their conspiracy with Mosquera, and to implement the public statements made by Mosquera, the paramilitaries began to renew their threats of violence against SINALTRAINAL members, including against Dorlahome Tuborquia. Specifically, the paramilitaries threatened to kill Tuborquia. In response to these threats, Tuborquia fled Carepa and went into hiding. The paramilitaries then seized Tuboquia's home to use as a base for their conspiracy to repeat their past success and force the new leaders of SINALTRAINAL to flee the area.

      40.     Throughout 1996, SINALTRAINAL members witnessed Bebidas y Alimentos Manager Mosquera socializing with members of the paramilitary forces and providing the paramilitaries with Coke products for their parties. The paramilitaries were also given free access to the Coke bottling plant, where they frequently appeared and intimidated the employees.

41.     At the outset of 1996, the new leadership of SINALTRAINAL and

Bebidas y Alimentos began negotiating a new labor agreement.  A key aspect of these

negotiations included SINALTRAINAL's proposals for increased security for threatened

trade unionists and a cessation of Manager Mosquera's threats against the union as well

as his collusion with the paramilitaries.  Defendant Richard Kirby personally participated

in these negotiations on behalf of Bebidas y Alimentos and, though he was well aware of

the dangers facing the Bebidas workers, particularly those belonging to the union, he

flatly refused the Union's requests in this regard.

42.     In response to the aforesaid events, SINALTRAINAL began a national

campaign in August of 1996 to call upon Bebidas y Alimentos, Richard I. Kirby and

Coke Colombia to protect the SINALTRAINAL leadership and members in Carepa from

what it feared was the imminent threat of attack by the paramilitaries acting in

furtherance of a specific conspiracy with Mosquera.

43.     By letter to Bebidas y Alimentos Manager Mosquera dated September 27,

1996, national leaders of SINALTRAINAL accused Mosquera of working with the

paramilitaries to destroy the union, and they urged that Bebidas y Alimentos ensure the

security of the workers in the Carepa plant in the face of the paramilitary threats.  Copies

of this letter were contemporaneously sent to Coke Colombia.  Richard I. Kirby was also

made aware of the contents of this letter shortly after it was sent to the plant manager.

Bebidas and Richard I. Kirby, though having the power to take necessary measures to

protect the lives of those workers at risk of paramilitary violence, willfully refused to act

upon the request in this letter to secure the lives of the workers and unionists at the

Carepa facility.

44.     On or around November 18, 1996, SINALTRAINAL presented a written

labor contract proposal to Defendant Bebidas y Alimentos.  This proposal included a

provision entitled, "Seguro de Vida" ("Assurance of Life"), which would have required Bebidas y Alimentos to provide heightened security in the plant to protect workers from assault by paramilitary forces. Manager Mosquera discussed this labor contract proposal in detail with Defendant Richard I. Kirby.

45.     On December 5, 1996, at 9:00 in the morning, two paramilitaries approached Isidro Gil, who was then a key negotiator for SINALTRAINAL in the contentious negotiations for the labor agreement with Bebidas y Alimentos, as he stood in the entrance of the Bebidas y Alimentos plant. According to several witnesses, they asked him if he was in fact Isidro Gil. Isidro Gil responded, "what for?" The paramilitaries stated that they needed to go into the plant to talk to someone inside. Isidro Gil proceeded to open the door and the two paramilitaries then shot him to death inside the plant. According to witnesses to these events, who will be able to identify the responsible paramilitaries, the two murderers were among the paramilitaries that had previously appeared at the plant with Mosquera, the plant Manager. That same night, these same paramilitaries went to the local union hall of SINALTRAINAL and started a fire therein. In murdering Mr. Gil and burning the Union office, these paramilitaries were acting pursuant to the conspiracy with the manager of Bebidas y Alimentos, Mosquera.

46.     Plaintiff Luis Adolfo Cardona, who was working inside the Bebidas bottling plant at the time, and was also an official for the SINALTRAINAL union, witnessed the murder of Isidro Gil. Shortly after witnessing this murder, Luis Adolfo Cardona was himself apprehended and kidnapped by the very same paramilitaries who killed Isidro. Specifically, Luis Adolfo Cardona was apprehended by the chief of the paramilitary block for Carepa en route to a union meeting scheduled to discuss the murder of Isidro. The paramilitary chief brought Plaintiff Cardona to a local bar where 8

paramilitaries, including the one who personally killed Isidro, were waiting for Cardona.

Cardona was held in the custody of these paramilitaries for almost an hour. He was

tortured and subjected to cruel, inhumane and degrading treatment during this time by

credible threats from the paramilitaries that he and his family would be murdered. He

was told that they were going to take him to the banks of the river where they would

further torture and then kill him because of his activism with the union and because of

his witnessing the murder of Isidro. Plaintiff Cardona was able to escape the

paramilitaries' clutches as their car pulled up to take him to the river bank, and he fled

with his family to Bogota, Colombia. Plaintiff Cardona and his family lived in hiding

with the assistance of SINALTRAINAL in Bogota and then in Medillin. However, even

while in hiding, he and his family continued to receive death threats from the Uraba-

based paramilitaries who continued to pursue him even to Bogota. As a result, he and his

family fled in exile to the United States where they have applied for asylum.

      47.    Meanwhile, on December 6, 1996, acting in furtherance of the previously

alleged conspiracy with the manager of Bebidas, Mosquera, paramilitaries approached

several more members of the local SINALTRAINAL executive board. These

paramilitaries told the union board members that they killed Isidro Gil and burned the

union office, and that they would kill the remaining board members if they did not leave

town. The paramilitaries also explained that they would have a meeting with the workers

at the Bebidas plant the next day to tell them that they would have to resign from the

union or face being killed.

      48.    On December 7, 1996 at 8:00 a.m., in furtherance of the previously

alleged conspiracy with the manager of Bebidas y Alimentos, Mosquera, the

paramilitaries appeared at the Bebidas y Alimentos plant. They assembled the workers

and told them that Bebidas y Alimentos did not want the SINALTRAINAL union at the

plant. The paramilitaries explained that the workers had the option of either resigning from the union or leaving Carepa altogether lest they be killed like their colleague, Isidro Gil. The paramilitaries then proceeded to direct the workers into the manager's office to sign resignation forms which were prepared by Mosquera and other staff of Defendant Bebidas y Alimentos. As a result of the murder of Isidro Gil and the threats of death to the other workers by the paramilitaries, workers resigned en masse from SINALTRAINAL. The conspiracy between Mosquera and the paramilitaries to drive away SINALTRAINAL's leaders and to destroy the union was completed.

49.     In fear for their lives, fourteen SINALTRAINAL members, including the remainder of the local SINALTRAINAL executive board, fled Carepa after this meeting on December 7, 1996. As a result of the flight of these individuals and the resignation of the other workers from the union, the local SINALTRAINAL union in Carepa was destroyed. This union has never returned to Carepa.

50.     The SINALTRAINAL members who fled Carepa on December 7, 1996 continue to fear for their life and continue to remain in hiding, moving frequently from house to house. Plaintiff SINALTRAINAL, as it does for all such displaced members, has helped provide support to these individuals and their families, including Luis Adolfo Cardona and his family. The Union has also provided financial and material support to the family of Isidro Gil following his murder.

51.     After the murder of Isidro Gil, the paramilitaries presented themselves at the Bebidas y Alimentos plant with the medical cards of workers which they had taken from the local union office before they burned it. Bebidas y Alimentos paid the paramilitaries renumeration in the amount owed under these cards. The paramilitaries

repaired the union office which they had burned and took it over for the purpose of storing their weapons.

52.     On December 26, 1996, the paramilitaries killed another Bebidas y Alimentos employee, José Herrerra.  The same paramilitaries later killed the wife of Isidro Gil in 2000, leaving their two children without parents. SINALTRAINAL has continued to provide financial and material support for the children.

53.     In 1997, Peggy Ann Kielland, a close relative of Defendants Richard I. Kirby and Richard Kirby Kielland, took over as the Manager of the Bebidas y Alimentos plant in Carepa.   Mosquera, directly involved in the murder of Isidro Gil, had gone into hiding. Very shortly after taking over, the conspiracy to rid the bottling plant of the Union completed, Ms. Kielland worked with the Chief of the Colombian military in the zone to ensure that the paramilitaries were no longer permitted to have access to the plant.

54.     Also in 1997, Defendant Richard I. Kirby met with Coke in this forum to ask for permission to sell the Bebidas y Alimentos business along with the Carepa plant. Coke denied him this request.

## VII.  DEFENDANTS' VIOLATIONS OF LAW

55.     Defendants' actions violate, and Plaintiffs' causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

(a)     Alien Tort Claims Act, 28 U.S.C. § 1350;

(b)     Torture Victim Protection Act, 28 U.S.C. § 1350;

(c)     Common law of the United States of America;

(d)     United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e)   Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f)   International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g)   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

(h)   Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i)   Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

(j)   International Labor Organization Conventions 87 and 98, which protect the fundamental rights to associate and organize;

(k)   Article 3 of the Geneva Conventions; and

(l)   Statutes and common law of the State of Florida, including but not limited to, wrongful death, negligence, and recklessness.

### VIII.   CAUSES OF ACTION

**First Cause of Action**
**The Alien Tort Claims Act, 28 U.S.C. § 1350**
**For Extra-Judicial Killing**
**On Behalf of John Doe Plaintiffs & SINALTRAINAL Against All Defendants**

56.   Plaintiffs incorporate by reference paragraphs 1 through 55 of this Complaint as is set forth herein.

57.     Defendants engaged in acts and omissions of intentionally and tortiously causing their employees and/or agents to murder Isidro Segundo Gil. Specifically, as is alleged above, Defendants' employee and/or agent, Mosquera, engaged in joint action with, and or conspired with, paramilitary forces that were operating under color of law, and, so acting, murdered Isidro Gil. Further, through their employees and/or agents, including Mosquera, Defendants knowingly aided and abetted the paramilitary forces that murdered Isidro Gil by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to murder Isidro Gil. These acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra*. The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary security force are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents or other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra*. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

58.     As a result of Defendants' wrongful acts directed against the individual Plaintiffs, Plaintiff SINALTRAINAL lost significant membership because other potential members and leaders have been intimidated and fear that similar acts of reprisal would be directed against them.

59.     Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not

24

limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra,* resulted in the death of Isidro Segundo Gil.  Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra.* Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra.*  The John Doe Plaintiffs seek compensatory and punitive damages for the injuries, including severe emotional and psychological trauma, they have suffered as a result of the murder of Isidro Gil.   John Doe I, on behalf of the Gil Estate and all of the heirs of Isidro Gil, also seeks compensatory and punitive damages in amounts to be ascertained at trial for the damges the latter are entitled to as heirs of the Isidro Segundo Gil.  The John Doe Plaintiffs further seeks equitable relief to prevent further human rights violations.

### Second Cause of Action

**The Torture Victim Protection Act, 28 U.S.C. § 1350**
**For Extrajudicial Killing**
**On Behalf of John Doe Plaintiffs & SINALTRAINAL Against All Defendants**

60.      Plaintiffs incorporate by reference paragraphs 1 through 55 of this Complaint as is set forth herein.

61.      Defendants engaged in acts and omissions of intentionally and tortiously causing their employees and/or agents to murder Isidro Segundo Gil.  Specifically, as is alleged above, Defendants' employee and/or agent, Mosquera, engaged in joint action with, and or conspired with, paramilitary forces that were operating under color of law,

and, so acting, murdered Isidro Gil. Further, through their employees and/or agents, including Mosquera, Defendants knowingly aided and abetted the paramilitary forces that murdered Isidro Gil by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to murder Isidro Gil. These acts amounted to an extrajudicial killing for purposes of the TVPA, violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra*. The paramilitary forces are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents and/or other state government entities, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra*. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

62.    As a result of Defendants' wrongful acts directed against the individual Plaintiffs, Plaintiff SINALTRAINAL lost significant membership because other potential members and leaders have been intimidated and fear that similar acts of reprisal would be directed against them.

63.    Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra,* resulted in the death of Isidro Segundo Gil. Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and

treaties listed in paragraph 55, *supra*. Defendants are also vicariously liable for any

violations of their employees or agents of the law of nations, customary international

law, and worldwide industry standards and practices, including, but not limited to, the

specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55,

*supra*.

64.     The John Doe Plaintiffs seek compensatory and punitive damages for the

injuries, including severe emotional and psychological trauma, they have suffered as a

result of the murder of Isidro Gil.   John Doe I, on behalf of the Gil Estate and all of the

heirs of Isidro Gil, also seeks compensatory and punitive damages in amounts to be

ascertained at trial for the damages the lattter are entitled to as heirs of Isidro Segundo

Gil.  The John Doe Plaintiffs further seeks equitable relief to prevent further human

rights violations.

**Third Cause of Action**
**Wrongful Death**
**on Behalf of John Doe Plaintiffs Against All Defendants**

65.     Plaintiffs incorporate by reference paragraphs 1 through 55 of this

Complaint as is set forth herein.

66.     Defendants committed, or acted in concert to commit, or Defendants' co-

venturers or agents committed acts that constitute wrongful death under the laws of the

State of Florida, the laws of the United States and the laws of Colombia, and that caused

the death of Isidro Segundo Gil.  John Doe represents the heirs of Isidro Gil at law

herein.  Plaintiff John Doe, on behalf of these heirs, seeks compensatory and punitive

damages which these heirs are entitled to *qua* heirs of the decedent Isidro Gil.  Plaintiffs

John Doe I and John Doe II also seek damages in their own right for pecuniary loss

resulting from loss of society, comfort, attention, services and support of Isidro Gil.

67.     Defendants' actions and omissions were a direct and substantial cause of the deaths of Isidro Segundo Gil. Defendants failed to use due care to protect him from injury and harm, thereby proximately causing his wrongful death. The John Doe Plaintiffs and The Estate and heirs of Isidro Segundo Gil, represented by John Doe I, are entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

## Fourth Cause of Action

### The Alien Tort Claims Act and Torture Victim Protection Act, 28 U.S.C. § 1350, For Torture and Cruel, Inhumane and Degrading Treatment or Punishment (CIDTP) On behalf of Plaintiffs Luis Adolfo Cardona & SINALTRAINAL Against All Defendants

68.     Plaintiffs incorporate by reference paragraphs 1 through 55 of this Complaint as is set forth herein.

69.     Defendants engaged in acts and omissions of intentionally and tortiously causing their employees and/or agents to apprehend and kidnap Plaintiff Luis Adolfo Cardona; threaten him with imminent bodily harm, including murder; and thereby force him into exile against his will. Specifically, as is alleged above, Defendants' employee and/or agent, Mosquera, engaged in joint action with, and or conspired with, paramilitary forces that were operating under color of law, and, so acting, murdered Isidro Gil and then proceeded to apprehend, kidnap and repeatedly threaten Luis Adolfo Cardona in retaliation for his union activity and his having witnessed the murder of Isidro Gil. Further, through their employees and/or agents, including Mosquera, Defendants knowingly aided and abetted the paramilitary forces that murdered Isidro Gil and tortured Luis Adolfo Cardona, by the acts described above, by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to murder Isidro Gil and torture Luis Adolfo Cardona. The

kidnapping and detention of and threats against Plaintiff Cardona were done intentionally and with malice to cause him severe mental and physical pain and suffering, and to have the lasting effect of causing Plaintiff to suffer from severe depression, nightmares and chronic loss of sleep. These acts amounted to torture and/or Cruel, Inhumane and Degrading Treatment or Punishment (CIDTP) for purposes of the ATCA and TVPA, violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra*. The paramilitary forces are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents and/or other state government entities, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra*. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

70.     As a result of Defendants' wrongful acts directed against the individual Plaintiffs, Plaintiff SINALTRAINAL lost significant membership because other potential members and leaders have been intimidated and fear that similar acts of reprisal would be directed against them.

71.     Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra,* resulted in the death of Isidro Segundo Gil. Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices,

including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra*. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 55, *supra*. Plaintiff Luis Adolfo Cardona seeks compensatory and punitive damages in amounts to be ascertained at trial.   Plaintiff Luis Adolfo Cardona further seeks equitable relief to prevent further human rights violations.

## IX. DEMAND FOR JURY TRIAL

72.   Plaintiffs demand a trial by jury on all issues so triable.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)   enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)   declare that Defendants have violated Plaintiffs' human rights and the laws of the State of Florida and the United States, as set forth herein;

(c)   award Plaintiffs compensatory and punitive damages;

(d)   grant Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Plaintiffs and other members of SINALTRAINAL;

(e)    award Plaintiffs the costs of suit including reasonable attorneys' fees;

(f)   award Plaintiffs such other and further relief as the Court deems just under the circumstances.

Respectfully submitted,


ATTORNEYS FOR PLAINTIFFS


Daniel M Kovalik
United Steelworkers of America
Five Gateway Center
Pittsburgh, Pa. 15222
(412) 562-2518
Fax (412) 562-2574

Terry Collingsworth
Natacha Thys
International Labor Rights Fund
 Suite 920
733 15th Street, N.W.
Washington, D.C. 20005
(202 347-4100; Fax 202 347-4885)


Mark Richard (FLA Bar No. 305979)
Osnat K. Rind (Florida Bar No. 958638)
PHILLIPS, RICHARD, RIND, P.A.
9360 SW 72 Street, Suite 283
Miami, FL 33173
(305) 412-8322
Fax (305) 412-8299

## CERTIFICATE OF SERVICE

I, Daniel M. Kovalik, do hereby certify that a true and correct copy of the Second Amended Complaint for Equitable Relief and Damages was served via U.S. mail, postage prepaid, on this 23rd day of May, 2005, on the following:

Faith E. Gay
White & Case L.L.P.
Counsel for The Coca-Cola Company and
Coca-Cola de Colombia, S.A.
4900 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
Telephone: 305/371-2700
Fax: 305/358-5744

William P. McCaughan and James A. Weinkle
Duane Morris LLP
Counsel for Richard I. Kirby and
Bebidas y Alimentos de Uraba, SA
Wachovia Financial Center, Suite 3400
200 South Biscayne Boulevard
Miami, FL 33131
Telephone: 305/960-2200
Fax: 305/960-2201

Robert M. Brochin
Morgan Lewis & Bockius LLP
Counsel for Panamco Colombia, S.A.
5300 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL  33131
Telephone: 305/579-0490
Fax: 305/579-0321

_____
Daniel M. Kovalik