FILED by _____ D.C.

SEP 2 9 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CLOSED
CIVIL
CASE

**Case Number:  01-3208-CIV-MARTINEZ-BANDSTRA**

IN RE SINALTRAINAL LITIGATION,

_____/

## CONSOLIDATED OMNIBUS ORDER DISMISSING THE CASES FOR LACK OF SUBJECT MATTER JURISDICTION

### I. INTRODUCTION

In 1980 the Second Circuit's *Filartiga v. Pena-Irala* decision held that official torture is prohibited under the law of nations, which ushered in a new era of litigation under the Alien Tort Claims Act[1] ("ATCA").  630 F.2d 876 (2d. Cir. 1980).  Since then, a number of individuals who directly engaged in violent human rights abuses, especially torture and extrajudicial killing, have been found liable.  Within the last decade, a significant number of cases have been filed that allege that major United States corporate entities are vicariously liable for human rights abuses abroad under the ATCA or the Torture Victim Protections Act ("TVPA").[2]  Due to the more abstract and diffuse nature of the corporate entities involved, this task is necessarily more difficult.  In order to prove his or her case, a plaintiff must connect actions and actors on the ground to subsidiary corporate entities, and in turn show the vicarious liability of the United States corporations.  Furthermore, it is difficult to demonstrate a relationship between corporate entities and the state actions that are a requirement for most ATCA torts.  As a result, it has been noted in oral argument before the Supreme Court that "in the corporate realm, there has not been a

---

[1]  28 U.S.C. § 1350.

[2]  18 U.S.C. § 1350, note, § 2(a).



judgment yet against a corporation in an alien tort statute case."[3]

Although the Eleventh Circuit has recently considered a case that involved violence against trade unionists in Guatemala, the facts alleged in the four consolidated cases before this Court are unprecedented.  The instant cases allege that paramilitary actors, whose actions should be imputed to the Republic of Colombia through "color of law" analysis, have used violence and threats of violence to systematically intimidate members of Colombia's largest food and beverage trade union, Sindicato Nacional de Trabajadores de la Industria de Alimentos ("Sinaltrainal").  Furthermore, the cases allege that the acts of violence and intimidation by the paramilitaries were done at the direction of, or with the cooperation of, managers that worked at soft drink bottling plants in Colombia.  The complaints further allege that these plant managers were working within the scope of their duties at their respective bottling plants, which are foreign affiliates of United States corporations.  In other words, Plaintiffs allege that the Defendants hired or conspired with paramilitaries (or local officials in one of the cases) to "rid" four Colombian bottling plants of the Sinaltrainal union, and that the Colombian government endorses or tacitly condones this activity.

These four cases present difficult legal questions that have not been squarely addressed by the Eleventh Circuit about how to properly evaluate subject matter jurisdiction in the ATCA context.  Furthermore, these cases rely on legal theories which are untested in any federal court.[4]

---

[3]  Comment of Paul L. Hoffman, Esq. made during oral argument before the United States Supreme Court.  United States Supreme Court Official Transcript of Oral Argument on March 30, 2004.

[4]  As is discussed *infra*, the *Gil*, *Leal*, and *Galvis* actions rely on a novel theory that "color of law" can be imputed from complicity between state entities to paramilitaries, and in turn from paramilitaries to the Defendants in this case.  See discussion in Section IV(B)(3) of this order, *infra*.

While the general requirements of notice pleading are well established, some of the seminal

decisions involving the Alien Tort Claim Act indicate that federal courts must engage in "a more

searching preliminary review of the merits," and that pleading "merely a colorable violation of the

law of nations" is not a sufficient basis for jurisdiction.   However, federal appellate courts have

not squarely defined the proper task of a district court in evaluating subject matter jurisdiction

under the ATCA, particularly in the context of cases involving theories of indirect liability that

rely on attenuated connections between the individuals who physically committed torts, state

entities, and multiple layers of corporate entities.   Thus, this Court faces a difficult task in

determining whether the instant complaints' harrowing allegations of violence and abuse, coupled

with murky allegations regarding the relationships between the violent actors, state entities, and

corporate entities, sufficiently plead a violation of the of the law of nations to afford this Court

subject matter jurisdiction.   Indeed, if the complaints merely allege torts and crimes of a local

nature, as opposed to torts in violation of the law of nations, then this Court lacks subject matter

jurisdiction.

A number of district courts have struggled with this dilemma, and some, with great

reluctance, have acquiesced to a finding that subject matter jurisdiction exists and that the case

should proceed.[5]  Although the principles of notice pleading are enshrined in the Federal Rules of

Civil Procedure and a body of interpretive case law, it is equally well established that federal

courts are courts of limited jurisdiction.   Furthermore, language in the Supreme Court's recent

ATCA decision suggests a need for "judicial caution" in implementing the jurisdiction of the

---

[5]  *See Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078 (S.D. Fla. 1997) (expressing "deep reservations" to its finding that the plaintiff had stated a claim and about the suitablility of the forum").

ATCA. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004). Demonstrating indirect liability for human rights abuses on the part of corporate entities is an inherently difficult task, and there is a risk that too high a pleading standard will prevent the discovery necessary to unearth involvement in the misdeeds that Congress hoped to remedy through the ATCA and the TVPA. However, there is also a risk that vague, conclusory, and attenuated allegations will allow individuals (and often the interest groups that finance or otherwise support their litigation) to engage in unwarranted international "fishing expeditions" against corporate entities and to abuse the judicial process in order to pursue political agendas.[6]

The district court's proper role in balancing these competing concerns has not been well defined. However, a number of cases suggest that a district court's task of recognizing violations of customary international law must be informed by the nature of the factual allegations before it. This Court does not purport to articulate a precise standard of pleading that is necessary to survive the "searching review of the merits" to ensure that a sufficiently colorable violation of the law of nations has been pled. After wrestling with the allegations of the instant cases, this Court concludes that the Plaintiffs' allegations in the instant cases are too conclusory, too vague, and too attenuated to adequately plead a violation of the law of nations to support subject matter

---

[6] Defendants characterize Plaintiffs' litigation as "part of their ongoing political campaign against 'globalization' and Plan Colombia," and argue that "Plaintiffs' aim is to force the Defendants, two U.S. corporations, one U.S. resident, and some of their foreign affiliates, to police the countries where they do business." (D.E. No. 54 at 2). Defendants also note that Plaintiffs' "chief advocate," the International Labor Rights Fund has recently filed a number of ATCA cases with very similar complaints. (D.E. No. 54 at 39). This Court notes that the International Labor Rights Fund also represented the plaintiffs in the *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 305 F. Supp. 2d 1285 (S.D. Fla. 2003) *aff'd in part and rev'd in part* 416 F.3d 1242 (11th Cir. 2006) *reh'ing en banc denied*, 452 F.3d 1284 (2006), a case which is referred to throughout this Order. This Court also notes that Defendants have filed several motions for sanctions. These motions for sanctions are still under advisement.

jurisdiction.

This Court first provides a brief overview of the basic facts and procedural history of the cases before it. Next, it discusses the body of case law discussing the level of appropriate review for determining whether a violation of the law of nations has been plead. It then evaluates the adequacy of the pleadings in the instant cases and finds that Plaintiffs have not sufficiently alleged a colorable violation of the law of nations for this Court to properly exercise subject matter jurisdiction in these cases. Finally, it discusses other pending issues in the cases, including improper and futile attempts amend the complaints.

## II. RELEVANT FACTS AND PROCEDURAL HISTORY

The four cases before this Court, which are factually related, have been administratively consolidated for pretrial purposes. (D.E. No. 151) in Case No. 01-CIV-3208 (consolidating case for pretrial purposes only and designating Case No. 01-CIV-3208 as the lead case). All of the cases involve violence and threats of violence against trade unionists in Colombia who have been employed in the soft drink beverage bottling industry and are members of Sinaltrainal ("Sinaltrainal" or "union").[7] Defendants are corporate entities, as well as one individual, that are involved in the soft drink bottling industry, more specifically in the business of bottling and distributing Coca-Cola products. The general gravemen of the Complaints is that the defendant corporations and individuals are vicariously liable, through theories of conspiracy, aiding and abetting, or joint action, for the violent actions of paramilitary members – whose actions should be imputed to the Republic of Columbia– in an attempt to intimidate union members and squelch

---

[7] Any reference to "Sinaltrainal" or "union," unless otherwise noted, refers to the respective local union for each of the four bottling plants.

union activity.

These cases were originally filed in a single action before the Honorable Paul C. Huck.

After Defendants jointly filed a motion to dismiss on the basis of subject matter and personal

jurisdiction (D.E. No. 35), which was fully briefed (D.E. Nos. 38 and 43), the Plaintiffs were

given leave file an amended complaint in the original action (D.E. No. 48) and to file three new

actions.[8]  Thus, the original suit became the four separate actions currently before the Court.  In

the instance of two of the resulting suits, the *Gil* and *Leal* actions, amended complaints were filed,

which represented a third version of the allegations in those cases.[9]  The Defendants jointly filed a

second consolidated Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E. No. 54 in

Case No. 01-CIV-3208-MARTINEZ), which was filed in all four cases and is fully briefed.[10]  *See*

_____

[8]  The three new complaints were assigned Case No. 02-20258-CIV-MARTINEZ, Case No. 02-20259-CIV-MARTINEZ, and 02-20260-CIV-MARTINEZ.

[9]  The Court notes that at that juncture, the Plaintiffs had the benefit of amendment after full briefing regarding the jurisdictional issues in the cases before filing the operative Complaints.

[10]  Essentially, the issues raised in this Order relate to the pending Motion for Clarification (D.E. No. 168).  That Motion seeks clarification of this Court's Order on subject matter jurisdiction dated March 28, 2003 (D.E. No. 103), which addressed the Defendants' joint consolidated Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E. No. 53).  This Court notes that the briefing related to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction was extensive.  The parties were given leave to exceed the Southern District of Florida's standard page limits.  (D.E. No. 52).
Defendant Panamco Colombia did not formally join in the motion to dismiss for lack of subject matter.  Panamco Colombia did join in a motion to dismiss for lack of personal jurisdiction.  (D.E. No. 55).  However, the parties do not dispute that Panamco Colombia is a subsidiary of Panamco.  In addition, Panamco Colombia is represented by the same counsel as Panamco and Panamerican, which are all related companies.
By virtue of the fact that this Court's subject matter jurisdiction as to Panamco (which is alleged to be vicariously liable for the actions of Panamco Colombia) turns on this Court's subject matter jurisdiction as to Panamco Colombia, and pursuant to Federal Rule of Civil Procedure 12(h)(3), this Court finds that it is appropriate to consider the subject matter jurisdiction of the Court as to Panamco Colombia.

(Case No. 01-CIV-3208-MARTINEZ D.E. Nos. 57 and 63).  An extensive four-hour session of oral argument was held before then-presiding Judge Huck.  Shortly thereafter, the Sinaltrainal actions were randomly reassigned to this Court by the Clerk of the Southern District of Florida for administrative reasons.  (D.E. No. 91).

On March 28, 2003 this Court issued an order which *inter alia*, dismissed the claims against the Coca-Cola defendants in all of the instant lawsuits for lack of subject matter jurisdiction, as well as the claims pursuant to RICO. *See generally* (D.E. No. 103).   This Court denied reconsideration of that order and also denied a motion to certify the order as a final judgment.[11]

Subsequently, this Court has held several extensive hearings, one of which included witness testimony, regarding issues of personal jurisdiction, the appropriateness of granting leave to amend several of the complaints, and the issue of sanctions relating to the reassertion of claims that had already been dismissed.  However, this Court's subject matter jurisdiction is still a contested and unresolved issue.[12]

While the factual allegations of the cases are familiar to the parties, this Court provides a brief overview of the basic factual allegations underlying the four Sinaltrainal actions.  All four of the complaints allege claims against companies that bottle Coca-Cola brand soft drinks.  In the *Gil* case, the local bottler is Bebidas y Alimentos de Uraba, S.A. ("Bebidas"), which is allegedly owned and controlled by Defendant Richard Kirby, who resides in the Southern District of

---

[11]  This Court emphasizes that the findings in this Order do not modify its ultimate conclusions with regard to subject matter jurisdiction over the Coca-Cola Defendants (i.e. The Coca-Cola Company and Coca-Cola de Colombia, S.A.) or the RICO claims.

[12]  See discussion in note 10, *supra*.

Florida. The Plaintiffs most recent Second Amended Complaint also alleges claims against Island Capital Investments, Inc., which is allegedly the "corporate shell" or "mere instrumentality" that Kirby uses to control Bebidas. *Id.* at ¶ 16. Similarly, the *Galvis*, *Garcia*, and *Leal* suits assert claims against the local bottlers that are owned and operated by Panamco Industrial de Gaseosas, S.A. (a/k/a Panamco Colombia, S.A.) ("Panamco Colombia"). Plaintiffs allege that Panamerican Beverages, Inc. ("Panamerican") and Panamco LLC ("Panamco") are vicariously liable for the actions of Panamco Colombia by virtue of an alter ego or agency relationship.

The essence of the complaints is that each of the bottling companies in Colombia is responsible for the efforts of its agents to intimidate members of the Sinaltrainal unions at each of the respective plants involved in the suits through cooperation with the Colombian right-wing paramilitaries. As is discussed *infra*, these allegations essentially rest on the theory that members of management at each of the four plants conspired with paramilitaries, who are operating under "color of law," to intimidate union members and attempt to eliminate the union. Accordingly, Sinaltrainal is a named plaintiff in each of the four complaints.

As both parties agree, the situation in Colombia has been nothing less than tragic. The events giving rise to these claims occurred against a backdrop of civil unrest that has plagued Colombia with violence and terror for over forty years. The civil unrest in Colombia includes clashes between so called left-wing guerrilla groups and right-wing paramilitary groups, particularly the United Self-Defense Group of Columbia ("AUC"). Colombian civilians at large have suffered from numerous murders, kidnappings, and other violent acts. The Court now provides a brief overview of the more specific allegations of the four operative complaints in the

instant cases.[13]

### 1. The *Gil* Complaint

Plaintiffs in this action are two individuals who allegedly represent the estate of Isidro Segundo Gil,[14] who is deceased, and Luis Adolfo Cardona.  Plaintiffs essentially allege that union leader Isidro Segundo Gil was murdered by paramilitaries inside the Bebidas y Alimentos de Uraba ("Bebidas") bottling Plant in Carepa, Colombia.  Plaintiff Luis Adolfo Cardona, who is also a union leader, allegedly witnessed the murder of Gil, and he was later detained, tortured, and threatened by paramilitaries, before escaping and being forced to live in exile.

Plaintiffs explain that in 1994 paramilitaries murdered two Bebidas workers who were members of the local Sinaltrainal union. Gil Compl. at ¶ 34.  The paramilitary forces in Carepa began to intimidate union members, telling them to resign from the union upon "threat of physical harm." *Id*. at ¶ 35.  As a result, a number of union members "began leaving town," and when the threats continued in 1995, every member of the executive board of the Sinaltrainal union had fled "in fear for their lives." *Id*.

In June of 1995, the local union elected a new executive board to replace the one that had

---

[13]  For the reasons discussed in Section VII, *infra*, this Court notes that the following are the operative complaints: (D.E. No. 270) in the *Gil* case, Case No. 01-3208-CIV-MARTINEZ; (D.E. No. 3) in the *Leal* case, Case No.02-20258-CIV-MARTINEZ; and (D.E. No. 1) in the *Garcia* case, Case No. 02-20260-CIV-MARTINEZ.  The Proposed Second Amended Complaint in the *Galvis* case, which was night-box filed on April 12, 2005 as an attachment to the Motion to Amend (D.E. No. 243) (filed in Case No. 01-3208-CIV-MARTINEZ after administrative consolidation), is the operative complaint to the extent that it does not add new parties.  See Section VII of this Order, *infra*.

[14]  There have been a number of legal issues raised regarding the standing of the estate of the decedent, Isidro Gil.  *See, e.g.* (D.E. Nos. 271, 273, 288, and 289).  Due to this Court's conclusion that it is without subject matter jurisdiction, these issues are now moot.

fled, and Isidro Gil was elected as a member of this new board. *Id.* at ¶ 36. In September of 1995, Richard Kirby, one of the three shareholders of Bebidas, hired Ariosto Milan Mosquera to serve as the plant manager of the Bebidas plant. After Mosquera fired a union leader, a judge found the discharge was unlawful, and Bebidas was ordered to rehire the employee. *Id.* at ¶ 37. As a result, "Mosquera began aggressively and publically threatening to destroy the union," and he conspired with local paramilitary leaders to "drive the Union out of the [Bebidas] bottling plant using threats of violence, and if required, actual violence." *Id.* at ¶ 38.

Later, on December 5, 1996 at 9:00 a.m. two paramilitaries approached Gil when he was standing in the entranceway of the Bebidas plant. *Id.* at ¶ 45. The paramilitaries asked Gil if he was in fact Gil, and he confirmed that he was. *Id.* The paramilitaries told Gil that they needed to go into the plant to talk to someone inside. *Id.* Gil complied with their request and unlocked the door. "Isidro Gil proceeded to open the door and the two paramilitaries then shot him to death inside the plant." *Id.* Later that night, the same paramilitaries started a fire that burned down the local Sinaltrainal union hall.

Plaintiff Cardona, who was working inside the plant at the time, witnessed the murder of Isidro Gil. *Id.* at ¶ 46. Shortly after the murder, the "very same paramilitaries who killed" Gil, as well as the chief of the Carepa paramilitaries, kidnapped Cardona when he was on his way to a union meeting to discuss the murder of Gil. *Id.* The paramilitary chief brought Cardona to a local bar where eight paramilitaries, including the one who "personally killed" Gil, were waiting for Cardona. Cardona was held in the custody of the paramilitaries for an hour, and he was "tortured and subjected to cruel, inhumane and degrading treatment during this time by credible threats from the paramilitaries that he and his family would be murdered." *Id.* The paramilitaries told

-10-

Cardona that they were going to take him to the "banks of the river where they would further torture and then kill him because of his activism with the union" and because he witnessed the murder of Gil.

However, Cardona "was able to escape the paramilitaries' clutches as their car pulled up to take him to the river bank." *Id.* Cardona and his family lived in hiding with the assistance of Sinaltrainal in Bogota and then in Medellin, Colombia. Cardona and his family eventually fled in exile to the United States, where they have applied for asylum. *Id.*

The *Gil* Complaint alleges the following causes of action: extrajudicial killing pursuant both to the ATCA and TVPA; cruel, inhumane and degrading treatment or punishment; and wrongful death under Florida and Colombian law.

### 2. The *Galvis* Complaint

Juan Carlos Galvis was the president of the local Sinaltrainal union in the Magdalena Medio region of Colombia. More specifically, the Panamco Colombia owned plant was in Barrancabermeja, Colombia, where intense conflicts have occurred between right-wing paramilitaries and left-wing guerillas. Galvis alleges that he has been receiving death threats from Colombia's largest paramilitary group, the AUC, for ten years. The AUC has threatened to kill him if he does not stop his union activities and leave the Union. Threats have been made to Galvis personally and to his wife over the phone, in writing, and on the walls inside the Panamco Colombia bottling plant in Barracabermeja.

On August 3, 2001, Galvis and his wife were stopped while driving their car past four armed paramilitaries, who then threatened Galvis with "physical harm, including assassination" if he did not "stop being such a loudmouth." Galvis Compl. at ¶ 69. On August 18, 2001 his name

appeared on an AUC "'hit list -- that is, a list of individuals which the AUC is threatening with murder-- published in a local newspaper." *Id.* at ¶ 70. Thus, "Galvis is presently in imminent danger of being killed by the AUC, and has been forced to flee his home and family in search of places to hide from this danger." *Id.* at ¶ 71. "On August 24, 2003, there was another unsuccessful attempt on the life of Galvis." *Id.* at ¶ 72. "Two men on a motorcycle pulled up beside the car in which Galvis was traveling, with the rider firing his gun several times into his car." *Id.* While Galvis "barely escaped with his life," he was "placed in imminent fear of death during the this incident." *Id.*

The *Galvis* Complaint alleges torture, under both the ATCA and the TVPA, and cruel inhuman and degrading treatment pursuant to the ATCA.

### 3. The *Garcia* Complaint

The facts of the *Garcia* Complaint arise from events at the Panamco Colombia plant in Bucaramanga. Sinaltrainal had a bargaining relationship with management at this plant for several years. In 1992 plant management began exhibiting antipathy toward the union, and accused the union leaders of being guerillas. In 1995 Panamco began to falter on its obligations under the labor agreement, which caused union members, led by Plaintiffs Garcia, Gonzalez, and Flores, to go on strike for approximately 120 hours. Plaintiffs allege that, as a result, Pamamco Colombia's Bucaramanga plant security chief, Jose Aponte, falsely accused the three individual *Garcia* Plaintiffs of planting a bomb. In response, local police entered the plant on March 6, 1996 and arrested Garcia, Gonzalez, and Flores. Colombian authorities later found that there was no bomb in the plant.

While in transport to the jail, Plaintiff Flores was "repeatedly and brutally beaten by

police." *Id.* at ¶ 36. Police officers also pointed a gun at him, threatening to shoot him. Plaintiffs allege that Aponte filed false charges against Plaintiffs "for the purpose of unlawfully detaining them" and subjecting them to "cruel torture in a filthy, unsanitary Colombian prison." *Id.* at 37. The Plaintiffs were incarcerated in the local Bucaramanga prison for six months. *Id.* at 38. The Plaintiffs were finally released upon the order of the Regional Prosecutor "who found the charges to be completely without merit." *Id.* at 41.

The *Garcia* Complaint essentially alleges the following cause of action: kidnapping, unlawful detention, torture, and crimes against humanity pursuant to the ATCA; torture pursuant to the TVPA; denial of the fundamental rights to associate and organize pursuant to the ATCA; arbitrary arrest and detention under Florida and Colombian law; false imprisonment under Florida and Colombian law; battery under Florida and Colombian law; assault under Florida and Colombian law; negligence under Florida and Colombian law; and intentional infliction of emotional distress under Florida and Colombian law.

### 4. The *Leal* Complaint

Plaintiff Jorge Humberto Leal was an employee at Panamco Columbia's Cucuta plant for over twenty years and a member of the Sinaltrainal union for approximately fifteen years. He was elected to the Claims Commission for the local union in the year 2000. Leal Compl. at ¶ 35. This commission hears complaints from the plant workers and seeks redress for these concerns from the employer. *Id.* On May 3, 2003, Plaintiff Leal presented petitions to the management of the bottling facility concerning wages and working conditions, including "security issues in light of the threats posed to them by the paramilitary forces in the region." *Id.* at ¶ 36. In response, the management at the Cucuta plant including Chief of Security Guillermo Galinda and manger of

Human Resources Cesar Acuna began threatening employees with discharge and other reprisals if they joined or continued their membership." *Id.* at ¶ 37. In addition, the management "intensified its campaign to discredit the union and its leaders by portraying them as dangerous subversives." *Id.*

When the company failed to respond to the union's petitions, Plaintiff Leal and four other union leaders held a demonstration in front of the bottling facility in Cucuta on October 20, 2000. Later, on December 13, 2000 Leal was kidnapped by two unidentified individuals on his way home from work. *Id.* at ¶ 40. The two individuals drove him in a car for about an hour and a half, taking him to a building on the edge of a forest, somewhere on the outskirts of Cucuta. *Id.* The individuals proceeded to blindfold Plaintiff, bind his hands, and take him into a dark room. *Id.* A man who identified himself as being a member of the AUC paramilitary group entered the room. *Id.* That individual asked Leal if he was a member of the union, and of the executive board of the union. *Id.* After Leal answered affirmatively, his blindfold was removed and one of the individuals showed him a news clipping with a photo of Leal and four other union leaders protesting in front of the Cucuta bottling facility. *Id.* Leal was "threatened with death if he persisted in his union activities." *Id.*

Plaintiffs allege that "Leal was held captive by these unknown individuals for a 24-hour period, during which time he was physically and psychologically tortured." *Id.* at 43. The two individuals who originally kidnapped Leal drove him to a neighboring town and released him. As a result of this incident, Leal "continues to live in fear for his life."

The *Leal* Complaint essentially alleges the following causes of action: kidnapping, unlawful detention, torture, and crimes against humanity pursuant to the ATCA; torture pursuant

to the TVPA; denial of the fundamental rights to associate and organize pursuant to the ATCA; arbitrary arrest and detention under Florida and Colombian law; false imprisonment under Florida and Colombian law; battery under Florida and Colombian law; assault under Florida and Colombian law; negligence per se under Florida and Colombian law; and the intentional infliction of emotional distress under Florida and Colombian law.

### III.   DISCUSSION OF THE ALIEN TORT CLAIMS ACT AND THE PROPER STANDARD FOR EVALUATING PLEADINGS IN THE CONTEXT OF THE INSTANT CASES

The Alien Tort Claims Act, which is also referred to as the Alien Torts Statute, states in its entirety: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Eleventh Circuit has recently stated that "[t]o obtain relief under the [ATCA], plaintiffs must be (1) an alien, (2) suing for a tort, which was (3) committed in violation of international law." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2006) (citing *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996)).[15] The Supreme Court has recently held that "although the ATS is a jurisdictional statute creating no new causes of action, the reasonable inference from the historical materials is that the statute was intended to

---

[15] It should be noted that the Eleventh Circuit panel in *Abebe-Jira*, quoted *Kadic* in an explanatory parenthetical, which noted that the ATCA "*confers federal subject-matter jurisdiction* when the following three conditions are satisfied . . ." *Abebe-Jira*, 72 F.3d at 848 (quoting *Kadic*, 70 F.3d at 238) (emphasis added). This language emphasizes that the ATCA is jurisdictional in nature, and it suggests that if a violation of the law of nations is not properly pled, then there is not subject matter jurisdiction. *See also* discussion of the Supreme Court's decision in *Bell v. Hood*, 327 U.S. 678 (1945), *infra*.

have practical effect the moment it became law." *Sosa*, 542 U.S. at 725.[16]

The Supreme Court further explained that the ATCA provides a cause of action "for the modest number of international law violations with a potential for personal liability at the time [of its enactment]." *Aldana*, 416 F.3d at 1246 (quoting *Sosa*, 542 U.S. at 723). Furthermore, "causes of action under the [ATCA] are not static; new ones may be recognized, if the claim is 'based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th century paradigms we have recognized.'" *Id.* (quoting *Sosa*, 542 U.S. at 725). However, the Supreme Court has explained that federal courts should exercise "great caution" when considering new causes of action, and maintain "vigilant doorkeeping ... thus [opening the door] to a narrow class of international norms [recognized] today." *Id.* (quoting *Sosa*, 542 U.S. at 728, 729) (brackets added by the Eleventh Circuit).

The Second Circuit's decision in *Filartiga v. Pena-Irala* is considered the seminal case for the modern era of litigation under the ATCA. *See Abebe-Jira*, 72 F.3d at 846 (describing *Filartiga* as "[t]he leading case interpreting the Alien Tort Claims Act."). In explaining the narrowing construction that has long been placed on the ATCA, the Second Circuit explained: "The paucity of suits successfully maintained under the section is readily attributable to the statute's requirement of alleging a 'violation of the law of nations' at the jurisdictional threshold. Courts have, accordingly, engaged in a more searching preliminary review of the merits than is required, for example, under the more flexible 'arising under' formulation." *Filartiga*, 630 F.2d at

---

[16] Section III of the Supreme Court's decision in *Sosa*, which held that the ATCA was a jurisdictional statute, was unanimous.

887-88.  Similarly, the Second Circuit later explained in *Kadic v. Karadzic*, another landmark

decision, that "it is not a sufficient basis for jurisdiction to plead merely a colorable violation of

the law of nations." 70 F.3d 232, 238 (2d. Cir. 1996).  That Court further explained that "[t]here

is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately

pleads a violation of the law of nations (or treaty of the United States)."  *Id.*

Furthermore, it bears emphasis that there are very few instances in which *private conduct*

can constitute a violation of the law of nations.  The Second Circuit explained that "Torture and

summary execution-when not perpetrated in the course of genocide or war crimes-are proscribed

by international law only when committed by state officials or under color of law."  *Kadic*, 70

F.3d at 234.  However, "a claim for state-sponsored torture under the Alien Tort Act or the

Torture Victim Protection Act may be based on indirect liability as well as direct liability."

*Aldana*, 416 F.3d at 1247 (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir.

2005)).  The Alien Tort Claims Act "'reaches conspiracies and accomplice liability,' and the

Torture Victim Protection Act reaches those who ordered, abetted, or assisted in the wrongful

act."  *Id.*  In construing this state action requirement, the Eleventh Circuit looks "to the principles

of agency law and to jurisprudence under 42 U.S.C. § 1983." *Id.* (citing *Kadic*, 70 F.3d at 245).

Notably, a panel of the Eleventh Circuit considered allegations very similar to those of the

instant cases in *Aldana v. Del Monte Fresh Produce, N.A., Inc.*  416 F.3d 1242 (11th Cir. 2005).

That case involved violence and intimidation against labor union leaders who worked on a banana

plantation in Guatemala.  Significantly, like the instant cases, the *Aldana* complaint relied on

theories of vicarious liability.[17]  The plaintiffs in that case asserted claims of torture, unlawful

detention, crimes against humanity, and denial of the fundamental right to associate and organize

under the ATCA and TVPA.  Rather than suing the individuals who physically perpetrated the

violent acts and threats on trade unionists, the *Aldana* plaintiffs sued the corporate entity that

owned the banana plantation where the plaintiffs worked as well as its Guatemalan subsidiary.

The Plaintiffs "rest[ed] responsibility for these acts upon a theory of joint action between

Defendants and the local officials."  *Id.* at 1291.

The district court in *Aldana* granted defendants' motion to dismiss for lack of subject

matter jurisdiction and failure to state a claim because the complaint did not adequately plead

violations of international law.  *Id.* at 1292-1300.  It explained that with respect to the third

element, the requirement that the tort was committed in violation of international law, the

complaint must identify the specific international law that the defendant allegedly violated.  The

district court adopted a higher standard of pleading than is traditionally required to survive a

12(b)(1) motion to dismiss: "The heightened pleading standard requires that the complaint identify

facts showing Defendants violated a specific international law."  *Id.* at 1292 (citing *Sinaltrainal*,

256 F. Supp. 2d at 1345,1352 (S.D. Fla. 2003)).

Notably, the general gravamen of the allegations in *Aldana* with regard to state action

reflected the same legal theories of those in the instant cases:

> This case presents a somewhat unusual issue of state action in the ATCA context. In
> most cases filed against corporations, the corporation is accused of complicity in what
> are clearly actions taken by state entities. Here, the issue is somewhat confusing, as
> both the official conduct component to properly ascribe state action and the actual

---

[17]  The Eleventh Circuit panel decision in *Aldana* attached a copy of the operative
complaint as an appendix.

participation of the corporate Defendants is unclear.

*Aldana*, 305 F. Supp. 2d at 1301. Thus, the district court first considered whether there was official conduct that created state action in the first place. Second, the district considered whether the corporate Defendants could be found liable under the joint action variant of the "color of law" jurisprudence. *Id.*

Although the Eleventh Circuit affirmed in part and reversed in part the district court, the Eleventh Circuit panel did not address the district court's finding that a heightened standard of pleading applied, nor did the panel explicitly discuss the application of Federal Rule of Civil Procedure 12(b)(1) to the complaint. The district court's order in the *Aldana* case was entitled "Order Granting Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction," *id.* at 1288, and it emphasized that the ATCA requires a more searching review of the merits to establish jurisdiction and survive a 12(b)(1) motion to dismiss. *See id.* at 1292. The Eleventh Circuit made no mention of Federal Rule of Civil Procedure 12(b)(1). *See generally, Aldana*, 416 F.3d 1242. While the Eleventh Circuit did cite from a body of case law discussing motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), it did not explain whether this analysis had any bearing on the district court's 12(b)(1) analysis. *See Aldana*, 416 F.3d at 1246 (citing *Chepstow Ltd. v. Hunt*, 381 F.3d 1077, 1080 (11th Cir. 2004); *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).

The Eleventh Circuit panel in *Aldana* did not expressly discuss the district court's finding that a heightened pleading standard did apply, but it emphasized that "[s]ome minimal pleading standard does exist," and that "'[p]leadings must be something more than an ingenious academic exercise in the conceivable.'" *Aldana*, 416 F.3d at 1248 (citing *Wagner v. Daewoo Heavy Indus.*

*Am. Corp.*, 289 F.3d 1268, 1270 (11th Cir. 2002) (discussing generally what might be a reasonable inference in the pleading context) (internal citation omitted) *rev'd en banc on other grounds*, 314 F.3d 541 (11th Cir. 2002)).  Similarly, in closing, the Eleventh Circuit panel stated:

> We commend the district court for remembering that some minimal pleading standard does still exist and for that court's serious and thorough examination of the complaint. We affirm the district court's order dismissing Plaintiffs' complaint *entirely*, except we vacate the dismissal of Plaintiffs' claims-under the Alien Tort Act and the Torture Victim Protection Act-for alleged torture based on intentionally inflicted mental pain and suffering.

*Aldana*, 416 F.3d at 1253 (emphasis added).

Thus, the Eleventh Circuit's *Aldana* decision leaves some uncertainty as to what the proper pleading standard is in the context of an ATCA case that relies on theories of vicarious liability, contains allegations of attenuated connections between the tortfeasors and the defendants, and requires a showing of state action as to many of the alleged violations of customary international law.  In particular, merely conclusory allegations regarding state action cannot satisfy a plaintiff's burden under the ATCA. *Aldana*, 416 F. Supp. 2d at 1301 (citing *Beanal v. Freeport-McMoran*, Inc., 197 F.3d 161, 165-169 (5th Cir. 1999) (affirming dismissal of complaint asserting claims under the ATCA and TVPA for lack of specificity)).  The Eleventh Circuit's decision also does not specify the extent to which the 12(b)(1) analysis in the context of an ATCA claim overlaps with that of a 12(b)(6) analysis, which seems especially significant in light of the fact that the Supreme Court has recently clarified that the ATCA is ultimately a jurisdictional statute.

Arguably, the distinction between the 12(b)(1) and 12(b)(6) standards may be somewhat blurred in the context of an ATCA case.  One leading treatise notes that, as a practical matter, the

difference between a Rule 12(b)(6) and a 12(b)(1) motion "is often difficult to discern."  5B

Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2006);

*see also Flores v. Southern Peru Copper*, 414 F.3d 233 (2d. Cir. 2003)

(combining subject matter jurisdiction and failure to state claim analysis in dismissing Alien Tort

Claims Act suit on both 12(b)(6) and 12(b)(1) grounds alleging that pollution from mining

company's Peruvian operations had caused severe lung disease).

In *Williamson v. Tucker*, the former Fifth Circuit provided an extensive analysis of the

proper standards to be applied under a 12(b)(1) analysis.  645 F.2d 404 (5th Cir. May 20, 1981).

The court explained that under a facial attack to subject matter jurisdiction: "A motion to dismiss

for lack of subject matter jurisdiction, Rule 12(b)(1), can be based on the lack of jurisdiction on

the face of the complaint. If so, the plaintiff is left with safeguards similar to those retained when a

Rule 12(b)(6) motion to dismiss for failure to state a claim is raised-the court must consider the

allegations in the plaintiff's complaint as true." *Id.* at 412.

The Fifth Circuit panel also observed that "[t]he Supreme Court has enunciated a strict

standard for dismissals for lack of subject matter jurisdiction when the basis of jurisdiction is also

an element in the plaintiff's federal cause of action." *Id.* at 405. (citing *Bell v. Hood*, 327 U.S. 678

(1945) (involving an implied right of action under the Fourth and Fifth Amendments)).  In *Bell v.*

*Hood*, the Supreme Court explained:

> Jurisdiction, therefore, is not defeated as respondents seem to contend, by the
> possibility that the averments might fail to state a cause of action on which petitioners
> could actually recover. For it is well settled that the failure to state a proper cause of
> action calls for a judgment on the merits and not for a dismissal for want of
> jurisdiction. Whether the complaint states a cause of action on which relief could be
> granted is a question of law and just as questions of fact it must be decided after and
> not before the court has assumed jurisdiction over the controversy. If the court does

-21-

later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction ....The previously carved out exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous. The accuracy of calling these dismissals jurisdictional has been questioned.

327 U.S. at 682.

However, this Court finds it notable that the Second Circuit's decision in *Filartiga* specifically contrasted the Supreme Court's "more searching preliminary review of the merits" in *O'Reilly de Camara v. Brooke*, 209 U.S. 45, 52 (1907) (disposing of a question of ATCA jurisdiction disposed of "on the merits"), with the Supreme Court's less searching review of the merits in *Bell v. Hood*, 327 U.S. 678, 682 (1945) (holding that general federal question jurisdiction was not defeated by the possibility that the averments in the complaint may fail to state a cause of action). Thus, it appears that the ability of a plaintiff to state a claim under the ATCA, a jurisdictional statute, has some bearing on the process of determining whether subject matter jurisdiction exists for 12(b)(1) purposes. As noted *supra*, the Second Circuit in *Kadic* noted that "it is not a sufficient basis for jurisdiction to *plead merely a colorable violation* of the law of nations." 70 F.3d at 238 (emphasis added). "There is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint *adequately pleads* a violation of the law of nations (or treaty of the United States)." *Id.* (emphasis added).

Furthermore, in advocating the necessity of some heightened pleading standard in the instant cases, the Defendants focus on the importance of the allegations of a conspiracy between paramilitaries and the Defendants in this case in order to link the Defendants to the paramilitaries and demonstrate that Defendant's action were pursuant to color of law. Defendants argue that the

-22-

Eleventh Circuit requires a "stringent standard" for pleading conspiracy, and they emphasize language in *Fullman v. Graddick*:

> In civil rights and conspiracy actions, courts have recognized that more than mere conclusory notice pleading is required. In civil rights actions, it has been held that a complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory. In conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged. It is not enough to simply aver in the complaint that a conspiracy existed. A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy.

739 F.2d 553, 556-57 (11th Cir. 1984). The Eleventh Circuit's *Aldana* decision did not specifically address the ramifications of conspiracy precedent in the context of establishing vicarious liability under the ATCA. The Eleventh Circuit panel found that a reasonable reading of the plaintiffs complaint sufficiently established affirmative state action. *Aldana*, 416 F.3d at 1249-50. Specifically, the court observed that a "favorable construction of the complaint [for the plaintiffs] is that the Mayor was one of the armed aggressors who intimidated the plaintiffs." *Id.* at 1249. Thus, the Eleventh Circuit held that the plaintiffs had sufficiently established state action through direct theories of liability, and it did not address theories that the Mayor's inaction facilitated and cause the harm. *Id.* at 1250.

Perhaps most notably, the Eleventh Circuit panel decision contained no discussion of whether the complaint sufficiently alleged joint action under color of law to extend vicarious liability to the defendant corporate entities. *See Aldana*, 305 F. Supp. 2d 1285 at 1304-05 (discussing joint action theories of vicarious liability under color of law jurisprudence and finding plaintiff's allegations insufficient to extend vicarious liability under "any 'color of law' analysis.") Indeed, in the instant cases, much like the *Aldana* case, it is the allegations regarding the attenuated relationship between the corporate entities and the alleged direct tortfeasors that are the

-23-

most bare-boned and conclusory.

This Court recognizes that some courts have called into question the viability of the Eleventh Circuit's holdings that heightened pleading standards apply in the context of certain types of cases. *See, e.g., Ross v. State of Ala.*, 15 F. Supp. 2d 1173, 1191 n.10 (M.D. Ala.,1998); *Arrington v. Dickerson*, 915 F. Supp. 1503, 1512-13 (M.D. Ala. 1995). Furthermore, the Supreme Court has observed that "our cases demonstrate that questions regarding pleading, discovery, and summary judgment are most frequently and most effectively resolved either by the rulemaking process or the legislative process." *Crawford-El v. Britton*, 523 U.S. 574, 596 (1998) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163,168-69 (1993)). Nevertheless, it appears that the heightened pleading standard in the context of certain cases, including some 42 U.S.C. § 1983 cases, is still the law of this Circuit. *See Maldonado v. Snead*, 168 Fed. Appx. 373, 379 (11th Cir. 2006) (citing *Fullman*, 739 F.2d at 556-57); *Ross v. State of Ala.*, 15 F. Supp. 2d at 1191 (same). It should be emphasized that in determining whether the actions of a defendant under the ATCA embody sufficient connection with state action in order to afford subject matter jurisdiction, courts often turn to the "color of law" cases under 42 U.S.C. § 1983.

After careful deliberation, this Court concludes that it is appropriate to require some heightened pleading standard when determining whether the complaints in the instant cases sufficiently plead facts showing that Defendants violated the law of nations. Thus, this Court must engage in a searching review, particularly with regard to allegations concerning conspiracy or joint action that purport to establish that the Defendants acted under the color of official authority. *See, Aldana*, 305 F. Supp. 2d at 130; *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 165-69 (5th

Cir. 1999) (affirming dismissal of complaint asserting claims under the ATCA and TVPA for lack of specificity).  After carefully reviewing the Complaints, this Court concludes that the allegations are too conclusory and lack sufficient specificity.  As is discussed further *infra*, the Complaints plead only "a merely colorable violation of the law of nations" which is not a sufficient basis for subject matter jurisdiction. *See Kadic*, 70 F.3d at 238.

## IV. DISCUSSION OF ATCA JURISDICTION IN THE INSTANT CASES

### A.  Universal Offenses that Do Not Require State Action

Plaintiffs argue that the paramilitary acts that constitute war crimes, including summary execution, torture, and unlawful detention, do not require a showing of state action.  *See* (D.E. No. 57 at 14).  As a general principle of law, they are correct.  Indeed, in the *Kadic* decision the Second Circuit held that private actors, as opposed to state actors, may be liable for a "handful" of offenses of universal concern, including war crimes.  *See Kadic*, 70 F.3d at 240.  However, Plaintiffs make only veiled references to war crimes in their complaints.  For example, the *Leal* Complaint notes that "noncombatants to the Colombian civil war, including Plaintiffs herein, are protected from human rights violations and other war crimes committed by any parties to the conflict, regardless of whether the combatant parties are formally recognized as government units." *Leal* Compl. at ¶ 28.

As the Defendants emphasize, *Kadic* defined war crimes as "the acts of murder, rape, torture, and arbitrary detention of civilians, committed *in the course of hostilities* . . . ." *Kadic*, 70 F.3d at 242. (emphasis added).  Plaintiffs fail to adequately allege facts to support this definition.  The Sinaltrainal complaints do not assert that the alleged offenses were acts of war committed by

combatants in the course of hostilities.  As Defendants emphasize, Plaintiffs allege that the Defendants' agents committed the "tortious actions . . . *in connection with and in furtherance of Coke's business interests and activities,*" rather than in furtherance of war hostilities.  *See, e.g., Garcia* Compl. at ¶¶ 25, 35; *Leal* Compl. at ¶¶ 25, 44. (emphasis added).  Similarly, in the *Garcia* case, the absence of allegations regarding any war crimes is more apparent.  Plaintiffs allege that the Plaintiffs were incarcerated by local police officers in Bucaramanga due to false bomb allegations.  Plaintiffs do not allege that this act had anything to do with paramilitary actions or other combatants involved in the Colombian civil war.

In their opposition to Defendants' motion to dismiss on the basis of subject matter jurisdiction, Plaintiffs skirt the issue of whether the alleged tortious acts were committed in furtherance of war hostilities.  Plaintiffs point to paragraphs of their complaints that establish general allegations about the state of civil war in Colombia, as well as to allegations about the nature of the acts that were purportedly committed, yet they fail to identify any allegations that the acts were committed in furtherance of war hostilities. (D.E. No. 57 at 15).

Furthermore, this Court finds Plaintiffs attempts to draw parallels between the facts of *Kadic* and the instant cases to be misplaced.  Plaintiffs opposition memorandum argues, attempting to track language of *Kadic*, that Plaintiffs are "noncombatant victims" of paramilitary combatants that are a roving horde of state sponsored insurgents.  *See* (D.E. No. 57 at 15-16).  However, this Court notes that the defendant in *Kadic* was the commander that had "ultimate command authority" over the Bosnian-Serb Military forces as a part of a genocidal campaign conducted in the course of the Bosnian civil war.  70 F.3d at 236-37.  Furthermore, the Second Circuit emphasized that in order to establish war crimes the alleged torts must have been "committed in

the course of an armed conflict." *Id.* at 244. As this Court has previously noted, the gravamen of Plaintiffs' Complaint is that the paramilitaries were working as agents of the corporations doing business in Colombia. *See, e.g.*, Leal Compl. at ¶ 2. Furthermore, the Complaints allege that these act were taken "in connection with and in furtherance of [Defendants'] business interests and activities." Garcia Compl. at ¶ 25, 35; *see also* Galvis Compl. at 60.

This Court notes that the failure of the Complaints to allege that the actions of the paramilitaries were in the course of hostilities was squarely addressed at oral argument before then-presiding Judge Huck. Transcript of Oral Argument on June 6, 2002 at 80-92. Judge Huck granted leave to amend the complaints by interlineation regarding the knowledge of Defendants regarding the paramilitaries practice of targeting trade union leaders. *Id.* at 90-93. As a result, the Plaintiffs submitted a motion to supplement the Complaints (D.E. No. 83), which this Court granted (D.E. No. 102). The amendments to each of the Complaints contained almost identical language:

> Coca-Cola Colombia, and by virtue of its alter ego and/or agency relationship with Coca-Cola, Colombia, Coca-Cola, along with Defendants Panamco and Panamco Colombia, acting through their alter egos, agents and/or employees, who knew that the paramilitaries in Colombia, combatants in the civil war, enthusiastically target trade union leaders for execution and torture, affirmatively acted to benefit from the civil war by making arrangements to have the paramilitaries target their union leaders. Plaintiffs, non-combatants in the civil war, were thus targeted for violence to further Defendants' business interest in becoming union-free, and the paramilitaries, acting on behalf of Defendants, were able to use violence to accomplish this end with impunity because there is a raging civil war that creates a lawless environment.

(D.E. No. 83).[18]

These general allegations that Defendants took advantage of a civil war to further their

---

[18] Language that is very similar to the quoted language has been incorporated into subsequent complaints in the instance of the *Gil* case. *See* Gil Compl. ¶¶ 31 and 59.

business interest seem a far cry from the universal offenses in *Kadic*, where the defendant was alleged to possess "ultimate command authority" and where he was alleged to have "personally planned and ordered a campaign of murder, rape, forced impregnation, and other forms of torture designed to destroy the religious and ethnic groups of Bosnian Muslims and Bosnian Croats." 70 F.3d at 237, 243. The Second Circuit, in discussing war crimes, emphasized that international law "imposes an affirmative duty on military commanders to take appropriate measure within their power to control troops under their command for the prevention of such atrocities." *Id.* at 243. Furthermore, the Second Circuit has also held that "indirect economic benefit from unlawful state action is not sufficient to support jurisdiction over a private party under the Alien Tort Claims Act." *Bigio v. Coca-Cola*, 239 F.3d 440, 449 (2d. Cir. 2000). The Defendants in the instant case fail to specifically identify sources of international law which afford the Defendants any similar affirmative duty for a private corporation to prevent the atrocities alleged in the Complaints.

Alleging that the Defendants "affirmatively acted to benefit from the civil war by making arrangements to have the paramilitaries target their union leaders" is a far cry from alleging that Defendants actually conspired with the paramilitaries to orchestrate hostilities. This Court emphasizes that Plaintiffs are not bringing claims against any paramilitary commander or paramilitary member. Rather, Plaintiffs seek to hold corporations accountable for the actions of their "agents and/or employees." This Court respectfully submits that Plaintiffs seek a dramatic expansion of ATCA jurisprudence, one which lacks support in either domestic or international law. As a result, this Court finds that in the context of the instant complaints, some modicum of specificity regarding the details of *affirmative* action, whether it be in the form of conspiracy or joint action to orchestrate hostilities, is required to adequately plead a violation of the law of

-28-

nations on the basis of war crimes or genocide. Furthermore, this Court finds that Plaintiffs must plead specific facts that demonstrate that the affirmative actions were within the scope of the employee relationship, as opposed to acts of a rouge employee.

A thorough analysis of the operative complaints, and indeed of the proposed amended complaints, demonstrates that Plaintiffs have failed to adequately plead facts that could give rise to either war crimes, genocide, or crimes against humanity under the necessarily heightened pleading standard required under the ATCA.[19] However, in an abundance of caution, this Court also finds that under any pleading standard, Plaintiffs have not adequately alleged facts that could give rise to subject matter jurisdiction for war crimes, genocide, or crimes against humanity.[20] Rather, Plaintiffs Complaints are rife with legal conclusions, which this Court need not accept as well-pleaded.[21] *Aldana*, 416 F.3d at 1246 ("conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."); *Solis-Ramirez v. U.S. Dept. of Justice*, 758 F.2d 1426, 1429 (11th Cir. 1985) (court not required to accept conclusions of law on a motion to dismiss). Thus, this Court finds that it lacks subject matter jurisdiction on the basis

---

[19] The discussion of the "color of law" analysis necessary to determine whether a defendant's action constitutes state action, *infra*, provides further analysis of the deficient pleadings in this case.

[20] This Court adopts the rationale and discussion of the district court in *Aldana*, 305 F. Supp. 2d at 1299-1301, which concluded that the crimes against humanity claims were not actionable. While the Eleventh Circuit clearly affirmed the district court's dismissal of the crimes against humanity claims, it is not clear to what extent the Eleventh Circuit adopted the district court's rationale. *Aldana*, 416 F.3d at 1246, *reh'ing en banc denied*, 452 F.3d 1284 (2006).

[21] *See, e.g.,* Leal Compl. at ¶ 28. (noting in conclusory fashion that "[t]he extent of the civil conflict is so pervasive that the country's civil war necessarily must be governed by the rules of war" and that Plaintiffs are protected from "war crimes committed by any parties to the conflict.")

of war crimes or crimes against humanity.

### B. Violations of International Law that Require State Action

Because this Court has found that Defendants have failed to adequately plead a universal offense that affords subject matter jurisdiction over private actors, this Court now considers whether Plaintiffs have sufficiently alleged state action. Sufficiently alleging that a defendant's conduct is under the color of official authority is a crucial component of a claim under either the ATCA or the TVPA. *Aldana*, 305 F. Supp. 2d 1285. In terms of the ATCA, "torture and summary execution-when not perpetrated in the course of genocide or war crimes-are proscribed by international law only when committed by state officials or under color of law." *Kadic*, 70 F.3d at 234. To meet the "color of law" requirements under the ATCA, "the challenged conduct must be attributable to the state, in other words, it must be official conduct." *Beanal v. Freeport-McMoran, Inc.*, 969 F. Supp. 362, 374 (E.D. La. 1997).

### 1.  Novel Issues Relating to the Relationship of Color of Law Jurisprudence in the Context of the ATCA with a Highly Attenuated Relationship between Defendants and State Action

This Court submits that this case presents issues of first impression regarding theories of imputing state action. In most ATCA cases filed against corporations, the corporation is accused of complicity in what are clearly actions taken by state entities. *Aldana*, 305 F. Supp. 2d at 1301(citing *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003)). Here, each of the Defendants is a private corporation or an individual, as opposed to a state representative or affiliate. As Defendants correctly note, nothing in the instant complaints demonstrates that Defendants' alleged acts "may be fairly treated as [those] of the state

-30-

itself." (D.E. No. 54 at 13) (quoting *Beanal*, 969 F. Supp. at 377). Thus, Plaintiffs must sufficiently allege that Defendants acted under "color of law" in order to sustain their ATCA claim.

However, the Defendants in the instant cases are at least two levels removed from the Colombian government.[22] Thus, Plaintiffs must sufficiently allege facts that sufficiently demonstrate: 1) that the Defendants are vicariously liable for the paramilitaries' actions, and 2) that the paramilitaries in question were sufficiently connected to the Colombian government so that they may be said to have acted "under color of law." For the reasons discussed *infra*, this Court concludes that the allegations are legally insufficient to impute liability for the paramilitaries' (or the police officers') action to the Defendants.

First, this Court emphasizes that Defendant makes a persuasive argument that Plaintiffs seek a dramatic expansion of ATCA jurisdiction.[23] A careful review of existing case law indicates

―――――――――――――

[22] Some Defendants and proposed defendants are at least three levels removed from the Colombian government. This Court recognizes that this analysis differs somewhat in the context of the *Garcia* case, in which the Plaintiffs allege that the Defendants acted directly with state officers.

[23] *See, e.g.*, Defendant's Memorandum Dismiss for Lack of Subject Jurisdiction (D.E. No. 54 at 38). Defendants argue:

> [Plaintiffs'] attempts to enlarge and distort the jurisdictional reach of the ATCA threaten to impose significant burdens on the U.S. judicial system – straining the resources of federal courts, imposing jury duty on communities having no relation to events at issue, and entangling the parties in conflicts of law issues and foreign legal systems. The detriment to international trade, business, and investment is also obvious. Foreign businesses with even the slightest connections to the United States will face higher legal costs, and U.S. companies will be deterred from doing businesses in foreign countries, harming international and domestic markets.

*Id.* at 39-40. This Court notes that while such policy concerns may be legitimate, they are more appropriately addressed by Congress. Accordingly, these policy concerns have no bearing on this Court's decision.

that no other federal cases have found subject matter jurisdiction with such an attenuated connection between defendants and state action, i.e. the tenuous connection between Defendants and the paramilitaries coupled with a murky relationship between the paramilitaries and the Colombian government. Notably, the Eleventh Circuit's recent panel decision in *Aldana* turned on the court's finding that the plaintiffs in that case had sufficiently alleged *direct* state action, that the mayor was not just physically present when the unruly mob abducted the plaintiffs at gunpoint, but that he was a participant. *Aldana*, 416 F.3d at 1249-50. Although the Eleventh Circuit made clear that "by their terms, the ATCA and the TVPA are not limited to claims of direct liability," that case involved an appeal from a jury verdict finding a Chilean military officer liable for the brutal stabbing of an economist during the "Caravan of Death" that followed a military coup. *See Cabello*, 402 F.3d at 1158. In the instant case, there are no conceivable allegations of direct state action.

Underpinning the instant litigation is Plaintiffs' novel legal theory that the "color of law" may be bridged between the paramilitaries and the state of Colombia, and in turn between the paramilitaries and the agents or employees of Defendants.[24] This Court is unable to find any

---

[24] Defense counsel at oral argument before then-presiding Judge Huck explained:

What the plaintiffs are trying to do here is completely unprecedented expansion and highly inappropriate application of ATCA jurisdiction, because they are asking this Court to say that under the ATCA, it's sufficient to establish the color of law requirement for a private party to conspire or act jointly, not with military government, official state actors, but with private actors, paramilitaries, who are supposedly supported by the military personnel . . . I was trying to think of a couple of analogies or concepts. One is to treat color of law as an infectious disease. If you have a private actor, a paramilitary, that acts jointly with a government actor and, therefore, acts under color of law, that somehow can be transferred to another private actor who may have conspired. And that's just simply not the case.

federal appellate decision that squarely addresses the viability of this legal theory.[25]  Reluctantly, this Court finds that Plaintiffs' legal theory is a viable one.  However, as is discussed *infra*, the Plaintiffs' allegations fail to plead facts that sufficiently demonstrate the necessary relationship between the Defendants and the paramilitaries so that state action may imputed to the Defendants in order to demonstrate more than a merely colorable violation of the law of nations.

### 2.  Color of Law Jurisprudence in the Context of ATCA

In construing the state action requirement, the Eleventh Circuit has made clear that it is the law of this Circuit to look "to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983." *Aldana*, 416 F.3d 1247-48.[26]  The Supreme Court has articulated four tests to determine whether private conduct constitutes state action: 1) the "nexus test;" 2) the "symbiotic relationship test;" 3) the "joint action test;" and 4) the "public function test."  *See Brentwood Academy v.*

_____

Transcript of Oral Argument on June 6, 2002 at 27.

[25]  This Court notes that one district court in the Eleventh Circuit considered similar issues involving corporate liability for paramilitaries' actions in Colombia in evaluating a motion to dismiss, and it found that subject matter jurisdiction existed.  *See generally*, *Estate of Rodriquez v. Drummond Co., Inc.* 256 F. Supp. 2d 1250 (N.D. Ala. 2003).  However, that district court, deferred resolving the sufficiency of the relationship between the defendant mining corporation and the paramilitaries until the summary judgment phase, emphasizing the allegation that "some of the paramilitaries that murdered the union leaders were dressed in Colombian military uniforms and were members of the Colombian military." *Id.* at 1264-65.

[26]  Notably, some recent district court decisions outside the circuit have found that "color of law" jurisprudence is not a sufficiently well developed international norm.  *Bowoto v. Chevron Corp.*, Case No. C 99-02506 SI, 2006 Westlaw 2455752. *7 (N.D. Cal. August 22, 2006) (noting "plaintiffs have not provided any international authority for the prospect that a private actor may be found to have acted under 'color of law' in cases involving international law;" *Doe v. Exxon Mobile Corp.*, 393 F. Supp. 2d 20, 26 (D.D.C. 2005) (observing that "[g]rafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states.")  The Eleventh Circuit has not squarely addressed the arguments made in this line of cases.

*Tennessee Secondary School Athletic Assoc.*, 531 U.S. 288, 296 (2001); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995). However, this Court emphasizes that most of the jurisprudence involving the ATCA involves a more direct relationship between state actors and the defendants in question. This Court finds that it is appropriate to compartmentalize the analysis by first evaluating the relationship between the Defendants and the paramilitaries, and then, if necessary, the relationship between the paramilitaries and the government of Colombia.

This Court notes that Defendants' Memorandum in Support of Motion to Dismiss (D.E. No. 54) focuses the analysis of the four state action tests on the relationship between the paramilitaries and the government of Colombia. In analyzing the relationship between Defendants and the paramilitaries (or police officers in the *Garcia* case), Defendants argue that Plaintiffs must allege facts, under a heightened pleading standard, that sufficiently demonstrate that paramilitaries were either: 1) acting as Defendants' agents, or 2) acting pursuant to a conspiracy with the Defendants. (D.E. No. 54 at 13-14). While this Court agrees that this analytical approach is a sound one, this Court notes that it seems that the analytical approach Defendants advocate fits most squarely in category of the "joint action test."

Indeed, the district court in *Aldana* noted that "[t]raditionally, either a conspiracy or 'willful participation' with the state actor will satisfy the 'joint action' test.'" 305 F. Supp. 2d at 1304 (citing *National Coalition Gov't of the Union of Burma v. Unocal*, 176 F.R.D. 329, 346 (C.D. Cal. 1997); *Collins v. Womancare*, 878 F.2d 1145, 1150 (9th Cir. 1989)). This Court finds that the "nexus test;" "symbiotic relationship test;" or the "public function test," which may have some bearing on the relationship between the paramilitaries and the Colombian government, are not applicable to the alleged relationship between the Defendants and the paramilitaries.

-34-

Plaintiffs argue that a "substantial degree of cooperative action between the state and private actors," which need not amount to private actors and state actors acting in concert, should suffice.  (D.E. No. 57 at 20) (citing *Wiwa v. Royal Dutch Petroleum Co.*, Case No. 96 CIV 8386(KMW), 2002 Westlaw 319877, *13 (S.D.N.Y. Feb. 28, 2002)).  However, this Court finds that the *Wiwa* case is distinguishable.

The district court in *Wiwa* declined to dismiss ATCA claims based on allegations that Royal Dutch Petroluem Co. and its subsidiaries recruited Nigerian police and military to carry out a "campaign of terror" on local populations, that included summary executions, torture, cruel, inhuman or degrading conduct and wrongful death.  The *Wiwa* complaint relied on numerous specific factual allegations that if proven at trial would establish extensive cooperation between the defendants and Nigerian government officials. *See Wiwa Complaint*, (D.E. No. 63, Exh. A)  The allegations included descriptions of specific dates when defendant managers wrote letters, made reference to the specific contents of the letters, referred to specific contents of internal memorandums, and alleged that Nigerian military troops used defendants' boats and helicopters.  Plaintiffs allegations are much more conclusory and vague.  This Court declines to adopt *Wiwa's* analysis.

### 3. Analysis of the Allegations of Conspiracy and Agency Relationship

This Court now evaluates each of the four complaints in the instant cases in order to determine whether the Plaintiffs plead adequate facts to demonstrate the necessary level of relationship between the Defendants and the paramilitaries.  This Court first notes that the four complaints contain nearly identical allegations of agency and conspiracy.  In addition, Plaintiffs' allegations regarding an agency relationship between Defendants and the paramilitaries, to the

extent that the Complaints explicitly allege that plant managers were acting as agents of Defendants, are wholly conclusory.[27]  Thus, the only viable theory advanced by Plaintiffs is that of a conspiracy between the paramilitaries and the Defendants.  However, an analysis of each of the complaints demonstrates that the allegations regarding conspiracy are insufficient, and thus the complaints allege only a "a merely colorable violation of the law of nations" that is insufficient to afford this Court's subject matter jurisdiction under the ATCA.

### a.  Analysis of the *Gil* Complaint

The *Gil* Complaint essentially alleges that the murder of Isidro Gil constitutes an extrajudicial killing and that the paramilitaries' mistreatment of Plaintiff Cardona constitutes "torture" and "cruel, inhumane and degrading treatment."  Gil Compl. at ¶ 46.  These events are framed in the Complaint as being part of a conspiracy between Bebidas management and the paramilitaries to destroy the union.  The Complaint alleges that "shortly after the return" of the employee who was terminated, but later judicially reinstated, the plant manager, Ariosto Milan Mosquera, "met with leaders of the paramilitaries in Carepa . . . [and] made a specific agreement to drive the Union out of the [Bebidas] bottling plant using threats of violence, and if required, actual violence."  *Id*. at ¶ 38.  The Complaint emphasizes "[t]his agreement constituted a conspiracy."  *Id*.  However, it should be noted that the paramilitaries are not identified by name, nor in terms of some specific affiliation (i.e. affiliation with the AUC, etc.), there are no dates or locations

---

[27]  For example, the *Gil* Complaint alleges that "through their employees and/or agents, including Mosquera, Defendants knowingly aided and abetted the paramilitary forces that murdered Isidro Gil by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to murder Isidro Gil."  Gil Compl. at 57.  The allegations remain silent as to when, where, and how the Defendants established the agency relationship.

-36-

regarding the formation of the conspiracy, there is no description of the terms of the conspiracy, and there are no facts whatsoever that indicate that Mosquera was acting as an agent of Bebidas when he conspired with paramilitaries.

Of the four complaints in the instant cases, the *Gil* Complaint contains the broadest description of a conspiracy in that the allegations in paragraphs 38 through 53 are all described as being a part of the conspiracy. While the Complaint describes a number of acts, which does give some sense of the alleged scope of the conspiracy, these allegations are vague as to the mechanics of how the members of the conspiracy had communicated or otherwise arranged to orchestrate the steps of the conspiracy. The Complaint contains many conclusory references to acts being "in furtherance of the conspiracy." *See, e.g.*, ¶¶ 39, 42, 45, 47, 48, and 53.

The "first step" of this conspiracy was that Mosquera, "speaking as an employee and the agent of Bebidas y Alimentos," publicly announced that he would use the paramilitaries in Carepa to destroy the union. *Id.* at 39. Also, Mosquera "in the presence of the paramilitary forces he had conspired with," told a member of the local union executive board that he would "sweep away the union." Next, the paramilitaries "began to renew their threats of violence." *Id.*

Notably, there are no specific allegations that indicate that the alleged conspiracy between Mosquera and the paramilitaries was in the scope of Mosquera's employment with Bebidas, or through an arrangement with Defendant Richard Kirby, who is alleged to have controlled Bebidas. The Complaint alleges that "[t]he paramilitaries that Mosquera conspired with were, as Richard I. Kirby was well aware, functioning openly in Carepa." *Id.* at ¶ 39. This allegation implies that Richard Kirby knew about this conspiracy, but it skirts the issue of whether he was involved in the conspiracy, and it lacks the necessary specificity to connect Kirby (who is alleged to have

controlled Bebidas) to the conspiracy. The Complaint indicates that the hiring of Mosquera pre-dates the explicit conspiracy. *See id.* at ¶¶ 37 and 38. The Complaint does allege that Mosquera was "an employee and agent of Bebidas." *Id.* at 37. However, this is a legal conclusion. There are no facts that indicate that Mosquera was acting as an agent of Bebidas *at the time* he made the explicit agreement with paramilitaries. Furthermore, the Complaint does not allege that Kirby hired Mosquera because he "already knew" the paramilitaries. *See id.* at ¶¶ 37 and 38.

It should also be noted that, unlike the allegations in the *Leal* Complaint, discussed *infra*, there are no specific allegations about any payment or other exchange between Mosquera and the paramilitaries. Although the *Gil* Complaint does refer to Bebidas paying paramilitaries some "remuneration in the amount owed under" medical cards of the workers that the paramilitaries had confiscated from the union office, the payment occurred *after* the completion of the conspiracy. *See id.* at ¶¶ 48, 51.

The Complaint alleges that Mosquera openly socialized with paramilitary forces and that Mosquera could be seen "providing the paramilitaries with Coke products for their parties." *Id.* at ¶ 40. The Complaint does not specifically allege that these products were provided for free, nor does it specifically allege whether this was one of the terms of the conspiracy. The Complaint also alleges that "paramilitaries were also given free access to the Coke bottling plant, where they frequently appeared and intimidated the employees." *Id.* at 40.

The Complaint emphasizes that the union sought, as a part of a labor agreement that was being negotiated, "increased security for threatened trade unionists and a cessation of Manager Mosquera's threats against the union as well as his collusion with the paramilitaries." *Id.* at 41. The Complaint alleges that "Kirby personally participated in these negotiations on behalf of

[Bebidas] and, although he was well aware of the dangers facing the Bebidas workers, particularly those belonging to the union, he flatly refused the Union's requests in this regard." *Id.* Similarly, other allegations focus on the fact that Kirby allegedly ignored a national campaign by the union to "call upon" Bebidas, Kirby, and Coke Colombia to "protect the Sinaltrainal leadership and members in Carepa from what it feared was the imminent threat of attack by the paramilitaries acting in furtherance of a specific conspiracy with Mosquera." *See id.* at ¶¶ 42 and 43. Furthermore, Bebidas and Kirby, "though having the power to take necessary measure to protect the lives of those workers at risk of paramilitary violence, willfully refused to act upon the request in this letter to secure the lives of the workers and unionists at the Carepa facility." *Id.* at 43. However, allegations relating to Bebida's or Kirby's failure to take action to protect the workers or unionists are not sufficient for this Court to have ATCA subject matter jurisdiction. *See Bigio*, 239 F.3d at 449.

Perhaps most notably, there is an utter absence of specific allegations connecting the murder of Gil or the kidnapping of Cardona to the conspiracy. The key paragraph that describes Gil's murder notes that "the two murderers were among the paramilitaries that had previously appeared at the plant with Mosquera." Gil Compl. at ¶ 45. Although this paragraph does allege that murdering Gil and burning down the Union office were acting "pursuant to the conspiracy with Mosquera," this is a very general allegation. The description of the conspiracy as a whole, throughout the complaint, contains general allegations of an agreement to drive out the union using "threats of violence and if required, actual violence." *Id.* at ¶ 38. The Complaint notes that witnesses identified the paramilitaries who approached and shot Gil and burned the union as being "*among* the paramilitaries that had *previously appeared* at the plant with Mosquera." *Id.* at ¶ 45

-39-

(emphasis added).  However, that allegation does not specify which paramilitaries, or identifiable group of paramilitaries, it is referring to.  Indeed, the Complaint states that paramilitaries "frequently appeared" at the plant.  *Id.* at ¶ 40. Lastly, this Court notes that the Complaint's allegation that "[i]n murdering Mr. Gil and burning the Union office, these paramilitaries were acting pursuant to the conspiracy with the manager of Bebidas y Alimentos" is a conclusion of law that need not be accepted by the Court at face value.  *See Aldana*, 416 F.3d at 1253.

While the allegations regarding Cardona's kidnapping and torture do specify that the paramilitary "who personally killed Isidro" was present, it is not clear that the paramilitaries were the same ones, or affiliated with the same ones, that Mosquera had allegedly conspired with.  Furthermore, the Complaint indicates that the same paramilitary who killed Gil was present, but it does not allege that he took any part in the kidnapping or torturing.  Similarly, the allegations concerning the "explicit agreement" do not sufficiently specify the scope of the terms of the conspiracy so that it can be said which actions were directly linked to that "explicit agreement."

The Complaint alleges that the paramilitaries ordered the union members to resign, and directed them to Mosquera, who had resignation forms prepared.  *Id.* at ¶ 48.  However, again, the allegations never state that the explicit conspiracy entailed this mechanism to bring about the end of the union.  The allegations indicate that workers resigned from the union "en masse," and that the "conspiracy between Mosquera and the paramilitaries to drive away Sinaltrainal's leaders and to destroy the union was completed."  *Id.* at ¶ 48.  Indeed, the Court notes that this last phrase best sums up the Court's concerns with the level of specificity regarding the allegations of conspiracy.  This Court finds that under case law regarding conspiracy in the Eleventh Circuit, as well as case law that suggests that some heightened standard of pleadings is required under the

ATCA, murky allegations of a vague conspiracy between Mosquera and unspecified paramilitaries to use threats and violence to "drive away" union leaders and "destroy the union" are not sufficient. While the Complaint details a number of horrific acts, it is scant on the details about the formation and orchestration of the conspiracy which links these acts together.  The Complaint certainly implies or suggests that these events are linked by a common plan, but in the context of what the Plaintiffs themselves describe as a country "torn by a long-standing civil war," where the murder of trade unionists and civilians at large is common, some level of specificity is required to link the "explicit agreement" between Mosquera and the paramilitaries to the horrible acts that occurred. *See id*. at ¶¶ 22, 32, 33.

This Court finds that the language of the Eleventh Circuit is especially appropriate: "In conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged. It is not enough to simply aver in the complaint that a conspiracy existed. A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy." *Fullman v. Gradick*, 739 F.2d 553, 556-57 (11th Cir. 1984).  Furthermore, a number of courts have required some level of specificity in ATCA cases involving similar allegations.  *See Aldana*, 416 F.3d at 1248-1253 (affirming in part dismissal of ATCA complaint for inadequate pleading); *Beanal v. Freeport-McMoran*, Inc., 197 F.3d 161, 165-169 (5th Cir. 1999) (affirming dismissal of complaint asserting claims under the ATCA and TVPA for lack of specificity).

This Court concludes that, at best, Plaintiffs' allegations assert a merely colorable relationship between the Defendants and the paramilitaries (who for present purpose this Court presumes to be state actors).  "[I]t is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations." *Kadic*, 70 F.3d 232, 238 (2d. Cir. 1996).  That Court

further explained that "[t]here is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States)." *Id.* This Court finds that the Plaintiffs in the *Gil* Complaint have not sufficiently pled a violation of the law of nations, and thus this Court does not have subject matter jurisdiction. To the extent that this Order conflicts with the Court's findings regarding Defendants Bebidas and Kirby in its March 28, 2003 order (D.E. No. 103), that order is vacated in part.[28]

### b. Analysis of the *Galvis* Complaint

The basic facts of the *Galvis* Complaint involve repeated threats of physical harm, including assassination, as well as one specific assassination attempt where someone shot from a motorcycle into the car that Galvis was traveling in. Much like in the *Gil* Complaint, the allegations rely on theories of conspiracy, which are inadequate. Tellingly, in the *Galvis* Complaint, Plaintiffs maintain that "*[u]pon information and belief,* [the] threats against Galvis are being carried out pursuant to a conspiracy between the local management of the Panamco Colombia bottling facility in Barrancabermeja, including [the plant manager], Reinaldo Gonzalez Buenaventura and leaders of the AUC, including Alex Prisco, designed to rid Panamco Colombia of the Sinaltrainal Union." Galvis Compl. at ¶ 75. Indeed, the Complaint fails to provide any critical information about the details of the conspiracy.

---

[28] A district court has authority to correct itself: "Civil Rule 54(b) confirms the trial court's necessary authority to correct itself. It provides that until the court expressly directs entry of final judgment, an order that resolves fewer than all of the claims among all of the parties 'is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.'" 18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478 (3d ed. 2006) (quoting Federal Rule of Civil Procedure 54(b)); *see also Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 & n.14 (noting in dicta that "every order short of a final decree is subject to reopening at the discretion of the district judge.")

The Plaintiffs' recitations of more specific facts in other portions of the Complaint contribute little to the allegations regarding the conspiracy. Plaintiffs allege that plant management including Reinaldo Gozalez Buenaventura "openly met and sided with AUC leaders including Alex Prisco, the head of the AUC for the Magdalena Medio region." *Id.* at ¶ 64. Furthermore, Plaintiffs allege that local management has "openly provided refreshments from the Coca-Cola facility, including containers of water and crates of soda, to AUC forces for celebrations and for their demonstrations against the ongoing peace process." *Id.*

Plaintiffs allege that Reinaldo Gonzalez Buenaventura "regularly permitted AUC leaders, including Alex Prisco, to enter and leave the bottling facility." *Id.* at 65. Plaintiffs cite an example of an incident in 1998 where a paramilitary leader "who was responsible for a massacre" was "permitted onto the premises" during labor contract negotiations. *Id.* Plaintiffs allege that one of the negotiators for Panamco Colombia management "ominously told" the Sinaltrainal negotiators that an AUC leader had left a message with the management that he was "available to collaborate about the things the company wanted," and that if there was a problem with the trade unionists, the AUC was available to "finish them."

Plaintiffs also allege that on March 16, 2001 Buenaventura "voluntary [sic] permitted" Alex Prisco, an AUC leader, along with ten armed AUC members, to enter the plant. *Id.* Buenaventura, at the request of Prisco, "proceeded to have the truck transporting AUC troops filled with containers of water to be used by the AUC troops while they maintained a blockade of the city in protest of the peace talks." *Id.* At that time, Prisco told Buenaventura "if he ever has any problems, he should feel free to call upon him for help." *Id.* Later, on May 13, 2001, the Coca-Cola management in Barrancabermeja, including Buenaventura, supplied the AUC with 100

crates of soda from the facility for a celebration the AUC was having." *Id.*

Later, on December 24, 2001 the management of the Coca-Cola bottling facility in Barrancabermeja "permitted AUC members to enter the plant." *Id.* at ¶ 66.  These members left pamphlets in the personal filing cabinets of workers and trade unionists, Alberto Diaz and William Mendoza, which "represented a threat of physical violence to them." *Id.*

From the outset, it should be noted that many of these allegations may be fairly characterized as a failure to act on the part of management, i.e. a failure to prevent paramilitaries from entering the plant, or a failure to prevent paramilitaries from leaving threatening pamphlets. However, failure of a private party to stop unlawful action does not confer subject matter under the ATCA.  *See Bigio*, 239 F.3d at 449.  To the extent that these allegations reflect affirmative conduct, they are insufficient to establish that the "threats against Galvis are being carried out pursuant to a conspiracy between the local management of the Panamco Colombia bottling facility in Barrancabermeja, including [the plant manager], Reinaldo Gonzalez Buenaventura and leaders of the AUC, including Alex Prisco, designed to rid Panamco Colombia of the Sinaltrainal Union." *Id.* at ¶ 75.  Indeed, while the Complaint alleges that the AUC offered Panamco Colombia management assistance with union problems, there are no allegations that the management took the AUC up on its offer.

Plaintiffs "information and belief" driven conspiracy allegations are devoid of names, dates, or locations regarding a conspiracy to rid the plant of the union or to intimidate Galvis specifically. The allegations of conspiracy are clearly insufficient under the heightened pleading standard necessary under the ATCA and the Eleventh Circuit's requirements for pleading conspiracy pursuant to *Fullman v. Graddick.  See Fullman*, 739 F.2d at 556-57.  Thus, these allegations are

not pled with sufficient particularity to show the necessary meeting of the minds between the alleged conspirators.

This Court concludes that Plaintiffs' allegations assert a merely colorable relationship between the Defendants and the paramilitaries (who for present purpose this Court presumes to be state actors). "[I]t is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations." *Kadic*, 70 F.3d 232, 238 (2d. Cir. 1996). That Court further explained that "[t]here is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States)." *Id*. Thus, this Court finds that the Plaintiffs in the *Galvis* Complaint have not sufficiently pled a violation of the law of nations, and thus, this Court does not have subject matter jurisdiction.

### c. Analysis of the *Garcia* Complaint

In the *Garcia* case, Plaintiffs allege that Pamamco Colombia's Bucaramanga plant security chief, Jose Aponte, falsely accused the three individual *Garcia* Plaintiffs (i.e. Luis Eduardo Garcia, Alvaro Gonzalez, and Jose Domingo Flores) of planting a bomb. They allege that "Aponte's plan *necessarily* required the cooperation and complicity of the arresting police officers, since the officers had to be wiling to arrest and imprison the union leaders without any evidence of the non-existent bomb." Garcia Compl. at ¶ 35 (emphasis added). Again, "[b]ased on information and belief," Plaintiffs allege that "Aponte conspired with the arresting police officers to unlawfully arrest and detain Plaintiffs." *Id*. Plaintiffs allege that the "basis for the conspiracy was either that Aponte arranged to provide payment to the officers for their participation or that the officers had a shared purpose with Aponte to unlawfully arrest and detain Plaintiffs because they were union

officials and had been branded by Panamco officials as leftist guerillas." *Id.*

Again, the other allegations in the Complaint are insufficient to establish the existence of a conspiracy.  For example, Plaintiffs allege that plant manager Jose Castro "with intent to undermine support for the union, told workers during 1992 contract negotiations that Sinaltrainal's labor contract proposal was supported by the 'guerillas.'" *Id.* at ¶ 32.  Castro also accused the unionists of being "guerillas." *Id.*  Plaintiffs allege that "in the context of Colombia, this is an extremely reckless statement that serves as a coded message to right wing forces that the person or persons accused are a legitimate target for violence." *Id.*

Plaintiffs also allege that the three individual Plaintiffs in the *Garcia* case led a strike against the plant. Garcia Compl. at 34.  Plaintiffs allege that, shortly after the strike, Jose Alejo Aponte told authorities that he found a bomb in the plant, and he accused five members of the local union executive board, including the [individual Plaintiffs]." *Id.*  In response to Aponte's allegation, local police entered the plant on March 6, 1996, and arrested [the individual] Plaintiffs. *Id.*

While in transport to the jail, Plaintiff Flores was "repeatedly and brutally beaten by police." *Id.* at ¶ 36.  Police officers also pointed a gun at him, threatening to shoot him. Plaintiffs allege that this "brutal and unnecessary treatment by the police officers was due to the fact that the officers were participants in a conspiracy with Aponte to unlawfully arrest and detain Plaintiff Flores for his union activities." *Id.*  Plaintiffs allege that Aponte then filed false charges against Plaintiffs "for the purpose of unlawfully detaining them" and subjecting them to "the cruel torture in a filthy, unsanitary Colombian prison." *Id.* at 37.  Plaintiffs allege that "Aponte, as the official documents demonstrate, was acting on behalf of 'Coca Cola Embotelladora Santander.'" *Id.*

-46-

This Court notes that the language in the Complaint regarding the existence of a conspiracy appears rather speculative on its face. This Court agrees with the Defendants that this allegation does not meet a notice pleading standard, much less the heightened standard that this Court has found to apply in the context of the ATCA. Plaintiffs fail to identify the conspiring police officers, and they present only vague terms of the conspiracy, which are pleaded in the alternative "either/or" form. Furthermore, although Plaintiffs try to draw parallels between the *Garcia* case and *Eastman Kodak v. Kavlin*, this Court finds the facts of that case to be highly distinguishable. *See* Plaintiffs Response to Motion to Dismiss (D.E. No. 57 at 22).

In *Eastman Kodak*, the district court "reluctantly" denied a motion to dismiss torture claim based on ten-day detainment accompanied by physical injuries, as a result of acts of corruption in the Bolivian justice system. However, the plaintiffs in that case alleged specific details of a conspiracy involving Bolivian officials. Plaintiffs in that case alleged that after plaintiff Carballo was arrested: 1) the distributor defendant used connections to have the case assigned to Judge Najera, who was sympathetic towards the defendants' lawyer, the godfather and uncle of his illegitimate child; 2) Judge Najera issued the warrant for the plaintiff Carballos' arrest, and the judge questioned the plaintiff for two hours before sending him to prison; 3) defendants advised Kodak, while Carballo was in prison, that the charges would be dropped on very specific business terms; 4) Carballo was freed from the Bolivian prison after Kodak yielded to the defendants' extortion; 5) defendants arranged to have two Kodak employees, the Kodak general manager and Carballo's supervisor, charged as criminal co-conspirators, and 6) their cases, as a result of defendants' actions were assigned to a judge who was the former husband of defense counsel's sister and it was that judge who convicted the Kodak personnel in absentia and sentenced them to

-47-

five years in prison. *See Eastman Kodak*, 978 F. Supp. at 1080-82.

The Plaintiffs in *Eastman Kodak* identified the alleged conspirators by name, including the state actors, as well as the specific judicial actions that were part of the conspiracy. *See id.* at 1092. In the instant *Garcia* case, there are no specific allegations about which state actors were involved, or how Aponte managed to convince the police officers or any other judicial actors to arrest and imprison the individual Plaintiffs. Thus, this case finds the *Garcia* case to be distinguishable from the *Eastman Kodak* case. Because the Plaintiffs' Complaint fails to allege specific facts as to the individuals involved in the conspiracy, its terms, or when it was formed, this Court finds that the allegations are insufficient to demonstrate more than a merely colorable violation of the law of nations. Thus, this Court finds that the Plaintiffs in the *Garcia* Complaint have not sufficiently pled a violation of the law of nations, and thus this Court does not properly have subject matter jurisdiction.

### d. Analysis of the *Leal* Complaint

The Leal Complaint alleges the paramilitaries, or their agents, kidnapped Leal and held him for twenty-four hours, physically and psychologically tortured him, and threatened to kill him if he continued his union activities. Much like the other complaints, the Leal Complaint alleges that Leal's mistreatment was a result of a conspiracy between plant management and the paramilitaries:

> Plaintiff Jorge Humberto Leal was kidnapped, detained, tortured and threatened . . . pursuant to a conspiracy between the local management of the Panamco Colombia bottling facility in Cucuta – including Guillermo Galinda, Cesar Acuna and John Ordonez – and leaders of the AUC, designed to rid Panamco Colombia of the Sinaltrainal union. The AUC carried out these actions in return for pay from Panamco Colombia which they receive directly from John Ordonez every 28th of the month.

*Id.* at ¶ 45. However, unlike the other complaints, there are some further details provided

regarding the conspiracy:

> [T]he management of the Cucuta plant, including John Ordonez, sales supervisor, began to meet and work with paramilitary forces, including the AUC, in the region. Specifically, the plant management, including Ordonez, began to pay these paramilitary forces $200,000 (Colombian pesos) a month in return for various services, including the intimidation of Sinaltrainal leaders and the eradication of the Sinaltrainal union itself. This relationship between the paramilitaries and the Cucuta management of Panamco Colombia continue until the present time, with John Ordonez meeting with AUC leaders and making the aforesaid payment to them every 28th of the month.

*Id.* at ¶ 38.

While these allegations are more specific than those in the other claims, there are still a number of noticeable omissions in the pleadings. For example, the allegations regarding the conspiracy state that paramilitaries were being paid for "various services" including the "intimidation of Sinaltrainal leaders and the eradication of the Sinaltrainal union itself." *Id.* Furthermore, none of the individuals involved in the kidnapping are identified, and it is not clear whether these individuals were among those "paramilitary forces, *including,* the AUC" that were paid. Again, much like those allegations in the *Garcia* complaint, the allegations in the *Leal* case lack the level of detail and specificity of the conspiracy allegations in the *Eastman Kodak* case. *See Eastman Kodak*, 978 F. Supp. at 1080-82. Furthermore, there are no specific allegations that management authorized or recommended any form of kidnapping or "physical and psychological" torture. Furthermore, as Defendants emphasize, the Leal Complaint tends to equivocate when it notes that "Defendants knowingly aided and abetted the AUC forces who unlawfully detained Plaintiff Leal by identifying Leal to these forces and by providing financial payments or some other support to these forces as part of the conspiracy." *Id.*

This Court finds that the conspiracy allegations in the *Leal* complaint are much closer to

-49-

meeting a sufficient pleading standard than the other three complaints. However, on balance, the tenor of the conspiracy dimension of the complaint, when read as a whole tends to be too "conclusory, vague and general." *See Fullman*, 739 F.2d at 556-57. For the reasons discussed in the context of the *Gil*, *Galvis*, and *Garcia* complaints, this Court concludes that the allegations in the *Leal* Complaint are also insufficient. This Court concludes that Plaintiffs' allegations assert a merely colorable relationship between the Defendants and the paramilitaries (who for present purpose this Court presumes to be state actors). "[I]t is not a sufficient basis for jurisdiction to plead merely a colorable violation of the law of nations." *Kadic*, 70 F.3d 232, 238 (2d. Cir. 1996). That Court further explained that "[t]here is no federal subject-matter jurisdiction under the Alien Tort Act unless the complaint adequately pleads a violation of the law of nations (or treaty of the United States)." *Id.* Thus, this Court finds that the Plaintiffs in the Galvis Complaint have not sufficiently pled a violation of the law of nations, and thus this Court does not have subject matter jurisdiction.

## V. DISCUSSION OF TVPA CLAIMS IN THE INSTANT CASES

Although the TVPA[29] creates a private cause of action for torture perpetrated by individuals acting under the color of law of any foreign nation, it does not confer jurisdiction standing alone. Claims for torture may be entertained only if they fall within the jurisdiction conferred by the ATCA *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996); *Kadic*, 70 F.3d at 246. As the Court has

---

[29] The TVPA provides, in relevant part, for a civil cause of action against an individual who, under color of law of any foreign nation, subjects another person to torture or extrajudicial killing. 18 U.S.C. § 1350, note, § 2(a). Torture is defined as any intentional act inflicting severe pain or suffering taken against an individual in the offender's custody or physical control for the purpose of obtaining information, punishment, or intimidation. *Id.* at § 3(b)(1).

found that Defendants have not properly pled a violation of the international prohibition against torture or extrajudicial killing, this claim must also be dismissed as the Court is now without jurisdiction. *Aldana*, 305 F. Supp. 2d at 1306. *See also Sinaltrainal*, 256 F. Supp. 2d at 1357.

## VI. THIS COURT DECLINES SUPPLEMENTAL JURISDICTION

This Court has found it does not have subject matter jurisdiction to consider Plaintiffs' ATCA, TVPA, and RICO claims. As this Court has dismissed all of Plaintiff's federal claims, this Court declines to retain jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) over Plaintiff's state law-based claims. *See United Mine Workers of America v. Gibbs*, 383 U.S. 714, 726 (1966) (stating "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").

## VII. MOTIONS TO AMEND

This Court has carefully considered the pending motions to amend in the *Galvis*, *Leal*, and *Garcia* cases. This Court also heard oral argument related to these motions on April 15, 2005. In short, Plaintiff alleges that the purchase of Defendant Panamco by Coca-Cola Femsa ("KOFEMSA") constitutes a significant change of circumstances that warrants amendment. (D.E. No. 182). On the other hand, Defendants argue that amendment is futile and untimely because the purchase took place in May 2003, after this Court had dismissed the Coca Cola Defendants, but before Plaintiffs filed their second motion requesting this Court to certify (D.E. No. 103) as a final judgment. *See* (D.E. No.195 at 5-6).

After carefully considering the pending motion to amend (D.E. No. 182), this Court finds that the proposed amendments are untimely and futile and that they should be denied. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (district court must reconsider numerous factors when

determining whether to grant leave to amend); *Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999) (noting that discretion is not abused by denying leave to amend when amendment is futile); *Nicor Int'l Corp. v. El Paso Corp.*, 318 F. Supp. 2d 1160, 1162 (S.D. Fla. 2004) (plaintiffs' motion for leave to amend denied as futile where proposed complaint would fail for lack of subject matter jurisdiction). Essentially, the proposed amendments seek to add another layer of Defendants, which does nothing to remedy the defects of the operative complaints in this case.

Similarly, Plaintiffs later filed a motion to amend the *Galvis* complaint. (D.E. No. 243). The proposed amended complaint sought to include new parties and allegations, in direct contravention of this Court's Order of Clarification as to Plaintiffs Sinaltrainal and Juan Carlos Galvis (D.E. No. 233 at 14-15). This Court finds that this motion to amend is untimely and futile. However, that proposed Second Amended Complaint, as Plaintiffs emphasized at the Status Conference on June 6, 2006, did contain new allegations about an incident where a paramilitary shot at Plaintiff Leal from a motorcycle on August 24, 2003. Thus, this Court finds that it is appropriate, in an abundance of caution, to allow the Plaintiff to amend the Galvis Complaint to the extent that the allegations do not relate to new parties or new theories. Thus, the motion to amend the *Galvis* Complaint is granted in part and denied in part. This Court has referred to the Second Amended Complaint in this Order. Nevertheless, for the reasons discussed in this Order, the amendment is ultimately futile.

## VIII. CONCLUSION

In conclusion, this court finds that it does not have subject matter jurisdiction. These four cases present difficult issues of law regarding the vicarious liability of corporate entities in the context of the ATCA. In light of the growing number of ATCA lawsuits involving corporate

defendants, issues of what level of pleading is necessary in the ATCA context, of how to determine vicarious liability, of the extent to which state action may be imputed to private actors, and of the extent to which § 1983 jurisprudence constitutes an established norm of international law are becoming increasingly urgent. This Court respectfully submits that there is a pressing need for clarification of these issues by the Eleventh Circuit Court of Appeals.

For these reasons, it is hereby:

**ORDERED AND ADJUDGED** that

1. The Panamco Defendants' Motion for Clarification of this Court's March 28, 2003 Order **(D.E. No. 168)** is **GRANTED in part**, consistent with the findings of this Order.

2. Panamco Colombia's Supplemental Motion to Dismiss for Lack of Personal Jurisdiction **(D.E. No. 169)** is **DENIED as moot** because this Court lacks subject matter jurisdiction.

3. Plaintiffs' Motion to Amend **(D.E. No. 182)** is **DENIED**.

4. Plaintiffs' Motion to Amend **(D.E. No. 243)** is **GRANTED in part and DENIED in part**, consistent with the discussion in this Order.

5. Defendant Bebidas' Motion to Quash Attempted Service of Process **(D.E. No. 276)** is **DENIED as moot** because this Court does not have subject matter jurisdiction.

6. Defendant Bebidas' Second Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction **(D.E. No. 277)** is **DENIED as moot** because this Court does not have subject matter jurisdiction.

7. The clerk is **DIRECTED** to **CLOSE** Case No. 01-3208-CIV-MARTINEZ; Case No.02-20258-CIV-MARTINEZ; Case No. 02-20259-CIV-MARTINEZ; and 02-20260-CIV-MARTINEZ. This is a final appealable order.

8.  This Court retains jurisdiction to consider the pending motions for sanctions, which will
be addressed in a separate order.

DONE AND ORDERED in Chambers at Miami, Florida, this 29 day of September, 2006.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record

-54-